NO. 4-08-0952                                    Filed 11/17/09

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | |
|---|---|
| In re: Torski C., a Person Found Subject to Involuntary Admission, THE PEOPLE OF THE STATE OF ILLINOIS, <br>        Petitioner-Appellee, <br>        v. <br> TORSKI C., <br>        Respondent-Appellant. | ) Appeal from <br> ) Circuit Court of <br> ) Sangamon County <br> ) No. 08MH865 <br> ) <br> ) Honorable <br> ) Esteban F. Sanchez, <br> ) Judge Presiding. |

JUSTICE APPLETON delivered the opinion of the court:

In November 2008, a petition was filed for the emergency involuntary admission of respondent, Torski C., alleging he was mentally ill, unable to understand his need for treatment because of the nature of his illness, and reasonably expected to engage in dangerous conduct. In December 2008, the trial court conducted a hearing and granted the petition. The court ordered respondent hospitalized for no more than 90 days.

Respondent appeals, claiming the applicable statutory sections are void for vagueness, facially unconstitutional, and unconstitutional as applied. We hold the definition of "dangerous conduct" set forth in section 1-104.5 of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/1-104.5 (West 2008)) void for vagueness. Further, we hold the application of that definition in section 1-119 of the Mental Health Code violates substantive due process. We vacate as void the court's order temporarily committing respondent to a mental-health institution.

I. BACKGROUND

On November 19, 2008, respondent's mother filed a petition seeking respondent's involuntary admission to a mental-health facility pursuant to section 3-700 of the Mental Health Code (405 ILCS 5/3-700 (West 2008)). The petition sought respondent's immediate hospitalization and alleged he was mentally ill and, because of his illness, he was (1) reasonably expected to engage in dangerous conduct (see 405 ILCS 5/1-119(1) (West 2008)) and (2) unable to understand his need for treatment and, if he was not treated, he would be expected to suffer mental or emotional deterioration to the point that he would reasonably be expected to engage in dangerous conduct (see 405 ILCS 5/1-119(3) (West 2008)). The petition also alleged respondent had been experiencing paranoid delusions of people trying to break into his home to kill him.

The trial court ordered respondent detained at Memorial Medical Center for examination. By the next day, respondent had been evaluated by three qualified examiners, who all had determined that respondent was in need of inpatient mental-health care due to his delusions and paranoia. All examiners were concerned that defendant would harm himself, or someone else, with the firearm that he admittedly carried for protection. A report of the examination performed by psychiatrist Stacey Horstman indicated that respondent had been hospitalized between July 31, 2008, and August 12, 2008, for psychiatric care. No other psychiatric history was indicated. On December 2, 2008, Dr. Aura M. Eberhardt, a psychiatrist at McFarland Mental Health Center (McFarland), examined respondent and formed the same opinion as the previous examiners.

On December 5, 2008, the trial court conducted a hearing on the petition for involuntary hospitalization. The State moved to strike the allegation filed pursuant

to section 1-119(1) of the Mental Health Code (405 ILCS 5/1-119(1) (West 2008)) and proceeded only on the allegation filed pursuant to section 1-119(3) (405 ILCS 5/1-119(3) (West 2008) ("[a] person with mental illness who, because of the nature of his or her illness, is unable to understand his or her need for treatment and who, if not treated, is reasonably expected to suffer or continue to suffer mental deterioration or emotional deterioration, or both, to the point that the person is reasonably expected to engage in dangerous conduct")).

Respondent's mother, Cassie Elston, testified that respondent was 31 years old and lived in his own apartment. She said in the past four or five months, respondent had become delusional. He reported (1) seeing an angel sitting on a nearby power station before it flew into his apartment, (2) he saw "[l]ittle bitty people," (3) he went to heaven and laid on God's feet, and (4) God speaks directly to him. Elston said: "Since [respondent] has been ill, he lives by that Bible." He had warned her that he will do whatever God tells him to do, including killing his 15-month-old son. Elston said her nephew, Barron Rice (a father figure to respondent), had been murdered three years earlier. Initially, after the murder, respondent was very angry. However, in the past few months, he had become delusional. Respondent told Elston that God had identified those responsible for the murder. God told him he needed to leave town because either someone was going to kill him or he was going to kill someone. For that reason, according to Elston, respondent carried a gun on his person at all times.

Elston said that in addition to Rice's murder, respondent had endured other personal traumatic experiences, such as his close friend having been sentenced to prison, a breakup with his girlfriend, and the birth of his child. She said respondent had

- 3 -

"so much on his plate" that "he kind of flipped out." Prior to these events, "[t]here was never anything wrong with his mind." Elston believed "that with medication [respondent's] mind would be different." Respondent had recognized his problem and asked to see a doctor, but he was unable to get an appointment for several months.

Aura Eberhardt, a psychiatrist, testified that respondent was admitted to McFarland on November 20, 2008, and examined by her on December 2, 2008. She diagnosed respondent with psychosis, not otherwise specified, due to his paranoid delusions and auditory hallucinations. According to respondent's medical records, he had told another psychiatrist that he was "plotting to do evil to the guys that killed his cousin." He believed his best friend had placed recording devices in his home to record his prayers. Dr. Eberhardt feared that respondent would act on his paranoid delusions and harm himself or others. In her opinion, if respondent did not receive treatment, he would suffer or continue to suffer mental or emotional deterioration. She said respondent denied having a psychiatric illness or needing treatment; however, she believed he lacked the capacity to understand his need for treatment.

Dr. Eberhardt reported that on November 29, 2008, respondent slapped a female patient's face. She again opined that respondent was in need of involuntary hospitalization to prevent further harm to himself and others. She had formulated a treatment plan, which she described as the least-restrictive alternative. She believed that once respondent was stabilized with treatment, he would do well in a group home.

On cross-examination, Dr. Eberhardt denied that religious ideas were an exception to the concept of a delusion. She said respondent had been attending group sessions and she had not yet prescribed any medication for respondent. The State

- 4 -

rested.

Respondent testified on his own behalf and stated that he had graduated from high school and barber school. He had been a barber for nine years. He said he did not intend to kill anyone and denied that God had told him to do so. Respondent said he has talked to God and God talks to him, but in the context of prayer. He said he did not recall the conversation with his mother about his son but, if they had the conversation, it was most likely in the context of a Biblical story. He admitted that he would do whatever God asked him to do because he wanted to "win favor in God's eyes." When asked if he would kill his son if God asked him to, respondent stated:

> "I'm pleading the [f]ifth [amendment] for that in the
> court of law, and as I just stated, I would not want to kill my
> son. I would want to teach my son values in life and why
> would I want to kill my son? I just stated not long ago[,] I
> would prefer to teach my son values. My aim is not to kill my
> son or kill no man for that reason. I strive to be a righteous
> man as I have told her before."

Respondent clarified that when he told his mother that he had seen angels, he meant that he had seen "the light." He did not mean that he saw angels fly. He said he has an angel watching over him at all times. He did not recall the conversation with his mother about seeing "little people." He stated:

> "No. I have never told my mother little people was
> [sic] coming into my apartment. I told my mother that these
> guys would--I have stated before--were out to kill me and

that they had plotted on coming into my home to kill me, to even come into my home to kill me is what I told her."

Respondent said he was certain that some men "here in town" were trying to kill him. He asked his mother for help to move away, saying that he feared that either he would be killed or he would kill someone in self-defense. He denied carrying a gun with him at all times but admitted carrying a knife. He kept his gun at his apartment. He named for the court some of the men that he claimed wanted to kill him--those who were responsible for Rice's murder.

Respondent testified that the altercation at McFarland started when the female taunted him, calling him a "nigger" and cursing at him. He had warned her that he would slap her if she continued. She continued, "so [he] went over there and [he] slapped her as [he] told her [he] would." He said he felt that he was in control of himself, although he could not deny that he could be involved in dangerous conduct. He said that if the people that are "out for" him attack him, he would be involved in dangerous conduct. He said his friend had placed recording devices in his home and had stolen several copies of his house keys. He said the friend knew respondent "slept hard and he could sneak around in [his] house." He said he has been in danger in the last few months.

The trial court questioned respondent as follows:

"THE COURT: Now, you testified just a few moments ago that you would get up in the middle of the night and hit--what did you say you hit?

A. No. I testified that my friend would tell me I

- 6 -

should get up in the middle of the night and punch on my punching bag. I never said that I did. I said that he said that--he used to try to advise me and tell me, 'Man, you should get up in the middle of the night and punch on that punching bag', and it wouldn't be just me and him around a lot of the times when he said this. Somebody may say or if I said, 'Why that [sic]?' 'Man, you never know how a fight might break out, somebody in your house when you're sleep-ing', you know what I'm saying? 'You better change your locks.' So he was prepping me in case I woke up and one of his brothers or one of his associates was in my house, you know what I'm saying?

THE COURT: Is that what you believed?

A. Yes, yes."

Respondent rested.

After considering the evidence and arguments of counsel, the trial court held the State had proved the allegations in the petition by clear and convincing evidence. The court ordered respondent involuntarily hospitalized for mental-health treatment at McFarland for a period not to exceed 90 days. This appeal followed.

## II. ANALYSIS

### A. Mootness

Initially, we note this case is moot. The trial court's order of December 5, 2008, authorizing respondent's involuntary hospitalization was limited to a period of 90

days.  That period has since passed.  However, a reviewing court may review otherwise moot issues pursuant to the public-interest exception to the mootness doctrine.  <u>In re Andrea F.</u>, 208 Ill. 2d 148, 156, 802 N.E.2d 782, 787 (2003).  "The criteria for application of the public[-]interest exception are: (1) the public nature of the question; (2) the desirability of an authoritative determination for the purpose of guiding public officers; and (3) the likelihood that the question will recur."  <u>Andrea F.</u>, 208 Ill. 2d at 156, 802 N.E.2d at 787.

The issue in this case falls within the public-interest exception as respondent has raised constitutional questions concerning the construction of sections 1-119(3) and 1-104.5 of the Mental Health Code (405 ILCS 5/1-119(3), 1-104.5 (West 2008)).  See <u>In re Robert S.</u>, 213 Ill. 2d 30, 45-46, 820 N.E.2d 424, 433-34 (2004) (procedures to be followed for the involuntary treatment of an individual involve matters of substantial public concern and are oftentimes reviewable under the public-interest exception to the mootness doctrine).  Therefore, we will proceed to review the case on the merits.  The standard of review for constitutional questions, like other questions of law, is <u>de novo</u>.  <u>People ex rel. Department of Corrections v. Millard</u>, 335 Ill. App. 3d 1066, 1070, 782 N.E.2d 966, 969 (2003).

### B.  Involuntary-Commitment Standards

It is well established that the imposition of involuntary mental-health services implicate an individual's substantial liberty interests.  <u>Robert S.</u>, 213 Ill. 2d at 46, 820 N.E.2d at 434.  The individual's liberty interests must be balanced against the State's interests (1) to provide care for persons unable to care for themselves and (2) to protect society from dangerous mentally ill persons.  <u>In re Robinson</u>, 151 Ill. 2d 126,

130-31, 601 N.E.2d 712, 715 (1992). Civil commitment procedures implicate the State's parens patriae powers and police powers. The State acts in the role of parens patriae with the purpose of protecting the mentally ill individual by depriving him of his liberty, not to punish him, but to treat him. The State also utilizes its police power to protect its citizens against potentially dangerous acts of mentally ill persons. Lessard v. Schmidt, 349 F. Supp. 1078, 1084 (E.D. Wis. 1972), vacated on other grounds, 414 U.S. 473, 38 L. Ed. 2d 661, 94 S. Ct. 713 (1974). Under both of these powers, the State may, ultimately, deprive a mentally ill individual of his or her fundamental right to liberty. "Thus, the procedures set forth in the [Mental Health] Code are a legislative recognition that civil commitment is a deprivation of personal liberty. The purpose of the procedures is to provide adequate safeguards against unreasonable commitment." In re James, 191 Ill. App. 3d 352, 356, 547 N.E.2d 759, 761 (1989).

Respondent claims that sections 1-119(3) and 1-104.5 of the Mental Health Code (405 ILCS 5/1-119(3), 1-104.5 (West 2008)), effective June 1, 2008, violate the due-process clause of the federal constitution. See U.S. Const., amends. V, XIV. Specifically, respondent argues that these statutory sections allow the State to involuntarily commit a person who refuses treatment without first requiring proof that he (1) is unable to make a rational decision to refuse treatment and (2) is considered a danger to himself or others. Respondent contends that both sections are facially unconstitutional, void for vagueness, and unconstitutional as applied.

"When analyzing the constitutionality of a statute on review, this court begins with the assumption that the statute is constitutional. [Citation.] *** If reasonably possible, this court has an obligation to construe a statute in a manner that would

uphold its constitutionality.  [Citation.]  ***  The party challenging the validity of a statute has the burden of establishing the statute's constitutional infirmity."  People v. Molnar, 222 Ill. 2d 495, 508-09, 857 N.E.2d 209, 217 (2006).  In any case, the burden is great, but it is especially great when the challenged statute addresses an issue in which the State has clearly defined powers, as is the case here.  The State has a well-established, legitimate interest under its parens patriae power in providing care to persons unable to care for themselves and also has the authority under its police power to protect the community from mentally ill persons determined to be dangerous.  Heller v. Doe, 509 U.S. 312, 332, 125 L. Ed. 2d 257, 278, 113 S. Ct. 2637, 2649 (1993).

Public Act 95-602 (Pub. Act 95-602, §5, eff. June 1, 2008 (2007 Ill. Laws 7839)), effective June 1, 2008, amended section 1-119 to provide as follows:

"'Person subject to involuntary admission' means:

(1) A person with mental illness and who because of his or her illness is reasonably expected to engage in dangerous conduct which may include threatening behavior or conduct that places that person or another individual in reasonable expectation of being harmed;

(2) A person with mental illness and who because of his or her illness is unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm without the assistance of family or outside help; or

(3) A person with mental illness who, because of the nature of his or her illness, is unable to understand his or her

- 10 -

need for treatment and who, if not treated, is reasonably expected to suffer or continue to suffer mental deterioration or emotional deterioration, or both, to the point that the person is reasonably expected to engage in dangerous conduct.

In determining whether a person meets the criteria specified in paragraph (1), (2), or (3), the court may consider evidence of the person's repeated past pattern of specific behavior and actions related to the person's illness." 405 ILCS 5/1-119 (West 2008).

The same public act also added section 1-104.5, which provides the following definition:

"'Dangerous conduct' means threatening behavior or conduct that places another individual in reasonable expectation of being harmed, or a person's inability to provide, without the assistance of family or outside help, for his or her basic physical needs so as to guard himself or herself from serious harm." 405 ILCS 5/1-104.5 (West 2008) (as adopted by Pub. Act 95-602, §5, eff. June 1, 2008 (2007 Ill. Laws 7839)).

Respondent argues that these amendments to the Mental Health Code are constitutionally infirm because they (1) lack a requirement of imminent dangerousness to self or others; (2) allow commitment upon a finding of the possibility of something

less than physical harm, such as financial, mental, or emotional harm; and (3) assume both the respondent's need for treatment and his refusal of treatment due to his incapacity to refuse treatment. Respondent was involuntarily committed under the third prong of section 1-119 (405 ILCS 5/1-119(3) (West 2008)); therefore, that is the only subsection of section 1-119 at issue in this case. We note that the State dismissed the count of its petition filed under section 1-119(1), which arguably could have been sustained at trial.

The United States Supreme Court has declined to prescribe strict boundaries for legislative determinations of what degree of dangerousness is necessary for involuntary commitment. See Developments in the Law: Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1206 (1974) (hereinafter Developments). Those decisions have been left to the states. The highest court has set forth only that our constitution prohibits the involuntary confinement of any person who is not mentally ill and not a danger to himself, others, or society. O'Connor v. Donaldson, 422 U.S. 563, 575, 45 L. Ed. 2d 396, 406-07, 95 S. Ct. 2486, 2493 (1975); Addington v. Texas, 441 U.S. 418, 429, 60 L. Ed. 2d 323, 333, 99 S. Ct. 1804, 1811 (1979). It is left to the states' legislatures to prescribe procedures and substance to this general standard.

"There may be factual issues to resolve in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists." (Emphasis in original.) Addington, 441 U.S. at 429, 60 L. Ed. 2d at 333, 99 S. Ct. at 1811. It is testimony from this imprecise science of psychiatry and

- 12 -

psychology, together with a trial court's interpretation of that testimony, that will ultimately determine whether an individual loses his freedom, at least temporarily. Because the science is so imprecise, it is of the utmost importance that the legislature provide strict guidance and precise definitions, to the extent reasonably possible, for the characteristics of those subject to involuntary treatment.

The due-process clause may be considered violated if the statute contains no clear standard for determining who may be treated against their will. See Kolender v. Lawson, 461 U.S. 352, 357-58, 75 L. Ed. 2d 903, 909, 103 S. Ct. 1855, 1858 (1983); City of Chicago v. Morales, 177 Ill. 2d 440, 449, 687 N.E.2d 53, 60 (1997), aff'd, 527 U.S. 41, 52, 144 L. Ed. 2d 67, 78, 119 S. Ct. 1849, 1857 (1999) (addressing the constitutionality of loitering statutes). A statute must be narrowly enough drawn that its terms can be given a reasonably precise content and those persons it encompasses can be identified with reasonable accuracy. O'Connor, 422 U.S. at 575, 45 L. Ed. 2d at 407, 95 S. Ct. at 2493. We will analyze the statutes at issue pursuant to these standards.

C.  State's Parens Patriae Powers

Under its parens patriae power, each state inherently has the duty to protect its citizens who cannot protect themselves. See Late Corp. of the Church of Jesus Christ of Latter Day Saints v. United States, 136 U.S. 1, 57, 34 L. Ed. 478, 496, 10 S. Ct. 792, 808 (1890). However, this power is not without limit and must satisfy due-process requirements. O'Connor, 422 U.S. at 580, 45 L. Ed. 2d at 410, 95 S. Ct. at 2496. Substantive due process demands that all state actions that affect fundamental liberty interests must be necessary to promote a compelling state interest. Roe v. Wade, 410 U.S. 113, 155, 35 L. Ed. 2d 147, 178, 93 S. Ct. 705, 728 (1973). To determine whether the

- 13 -

amended statutes satisfy due process in the context of the exercise of the State's police powers, we must analyze the individual factors or elements of the statutes that would ultimately trigger those powers.

### 1. Decisional Capacity

First, we address the individual's capacity to make his or her own treatment decisions. To satisfy due process, it is understood that the State's powers cannot be extended to those individuals capable of making their own treatment decisions. The State has no interest or authority to assert its parens patriae power over those who can protect themselves. Diminished capacity, erratic behavior, or a mental illness does not necessarily render a person incapable of making rational decisions. O'Connor, 422 U.S. at 575, 45 L. Ed. 2d at 407, 95 S. Ct. at 2493-94. The statute, therefore, must recognize the possibility that some mentally ill patients are capable of making decisions regarding their treatment. Indeed, many forms of mental illness have a specific impact on sufferers, leaving decision-making capacity and the ability to reason unimpaired. See Developments, 87 Harv. L. Rev. at 1214. Thus, it is the nature of the mental illness that becomes pivotal in determining whether a respondent is capable of making his own treatment decisions.

In this regard, we find the amended statute satisfies the due-process requirement by specifically requiring proof of the nature of the mental illness and its effect on the decision-making process. See Lessard, 349 F. Supp. at 1094 (a mentally ill patient could have similar capacity to make treatment decisions as a physically ill patient). Thus, as a prerequisite to the exercise of the State's parens patriae powers, the courts must find that a respondent lacks the ability to make reasonable treatment

decisions. This finding can be based upon the mental-health professional's subjective testimony regarding the particular mental illness from which a respondent suffers.

In proceedings to involuntarily commit an individual, the State must prove the necessary allegations, including the nature of the mental illness and its effect on the individual's decision-making capacity, by clear and convincing evidence. In re Stephenson, 67 Ill. 2d 544, 556, 367 N.E.2d 1273, 1278 (1977). "A factual basis for the medical opinion upon which the decision to commit is based must be judged by a similar standard." In re Orr, 176 Ill. App. 3d 498, 505, 531 N.E.2d 64, 69 (1988); see also In re Slaughter, 253 Ill. App. 3d 718, 723, 625 N.E.2d 832, 835 (1993) (a medical opinion with a sufficient factual basis may alone constitute clear and convincing evidence).

Given these standards, we find section 1-119(3) provides sufficient safeguards so as to satisfy due process with regard to addressing only those mentally ill individuals who are incapable of making their own rational treatment decisions. The mental-health professional must provide his or her subjective opinion as to the nature of the respondent's mental illness and the effect that particular mental illness has on the respondent's ability to make his or her own treatment decisions. Should the court determine, after considering this testimony, that the respondent is not incompetent, then he or she remains free to refuse treatment.

## 2. Mental or Emotional Deterioration

The State's powers of parens patriae are also triggered in the statute's second factor--if the mentally ill person is not treated, he or she is reasonably expected to suffer or continue to suffer mental or emotional deterioration. This factor calls for foresight and, again, depends on the subjective testimony of the petitioner and/or a

medical professional to explain the consequences of the risks of foregoing treatment. This factor is merely an adjunct to the next factor (the dangerousness of the individual) and is not, in and of itself, needed to satisfy the due-process requirements that are necessary before commitment.

As we have previously stated, the Supreme Court has repeatedly held that due process is satisfied if the State proves by clear and convincing evidence that the individual is mentally ill and that he or she requires hospitalization or involuntary treatment for his own welfare and the safety of others. See O'Connor, 422 U.S. at 575, 45 L. Ed. 2d at 407, 95 S. Ct. at 2493; Addington, 441 U.S. at 429, 60 L. Ed. 2d at 333, 99 S. Ct. at 1811. Thus, we need not decide whether the phrase "and who, if not treated, is reasonably expected to suffer or continue to suffer mental deterioration or emotional deterioration, or both, to the point that the person is reasonably expected to engage in dangerous conduct" (405 ILCS 5/1-119(3) (West 2008)) is vague, overbroad, or violative of due-process requirements.

This "deterioration" factor is nothing more than part of the court's analysis of whether a mentally ill individual poses a sufficient danger in order to be constitutionally confined. The analysis of whether the individual is deteriorating, either mentally or emotionally, should take into account the severity of his or her symptoms, past patterns of behavior, and whether known risk factors exist. As it is part of the analysis of predicting a respondent's future dangerousness, it is not, in and of itself, a standard subject to constitutional scrutiny. The trial court must determine, based on the testimony provided, whether the respondent is decompensating to the extent that he or she requires involuntary hospitalization and treatment to prevent foreseeable harm.

- 16 -

This factor aids the trial court in making a prediction regarding the anticipated risk of harm.  "If predictions could be made with sufficient accuracy [citation] and if the allegedly dangerous individual were accorded the safeguards required by procedural due process, [citation], it would seem difficult to argue that society could not act to avoid a serious harm."  Developments, 87 Harv. L. Rev. at 1229 n.150.  It is the determination of the degree of harm and the extent of the respondent's dangerousness that requires significant scrutiny.  We discuss those issues below.

D.  State's Police Powers

Once a mentally ill individual meets the threshold requirement of diminished decisional capacity, the State's police-power authority to commit him depends on whether the magnitude of the threat he poses to its citizens exceeds the deprivations imposed by involuntary commitment.  Generally, a valid exercise of the State's police power must promote public interests, which require the State's interference; and the means must be reasonably necessary to accomplish the purpose and not unduly oppressive on the individual.  Goldblatt v. Town of Hempstead, 369 U.S. 590, 594-95, 8 L. Ed. 2d 130, 134, 82 S. Ct. 987, 990 (1962).  However, when the State's police-power action infringes fundamental liberties, the public interests advanced must be "compelling" and the action taken must be the least-restrictive alternative to serve those interests.  Bates v. City of Little Rock, 361 U.S. 516, 524, 4 L. Ed. 2d 480, 486, 80 S. Ct. 412, 417 (1960).

Although the State's goal in protecting society from harm certainly justifies police-power action, whether the State's interest is great enough to support imposition of the deprivations associated with civil commitment depends on the nature of the threat posed by the mentally ill individual.

"The exercise of the police power to confine persons in antici-
pation of future criminal behavior has been challenged as a
denial of the fundamental fairness guaranteed by the due[-]
process clause and as an impermissible punishment for
status.  Nevertheless, society's interest in reducing harmful
conduct might make preventive detention of dangerous
persons constitutionally acceptable." Developments,  87
Harv. L. Rev. at 1228-29.

See also Williamson v. United States, 184 F. 2d 280, 282 (2nd Cir. 1950) ("Imprison-
ment to protect society from predicted but unconsummated offenses is so unprece-
dented in this country and so fraught with danger of excesses and injustice").

Unlike other members of society, the mentally ill may be confined for the
protection of the community because of their potential for doing harm, rather than
because of the harm they have caused.  Whether the State's interest is compelling
depends on the varying degrees of dangerousness presented.  It is most likely not
compelling enough to hospitalize a mentally ill individual with the hope of preventing
behavior that is difficult or somehow outside the normative expectations of society.
Instead, a valid exercise of the State's police power shall be taken only in the interest of
preventing behavior likely to result in injury to one's self or others.  Thus, the State's
authority depends on whether the magnitude of the threat the mentally ill person poses
to society, when balanced, exceeds the deprivations imposed on the individual by
involuntary commitment.

Since the dangerousness of an individual is the product of the magnitude

of the harm he or she is predicted to cause and the probability that he or she will cause it, an assessment of both factors is necessary to calculate society's interest in the preventive detention of a particular person. See Cross v. Harris, 418 F.2d 1095, 1099 (D.C. Cir. 1969) (determination of a person's "dangerousness" depends on the likely act and the harm it will cause). However, some types of behavior, even if certain to occur, may present too minimal a threat to society to justify confinement.

To satisfy due process, the exercise of the State's police power must be directed to prevent harm greater than a minor physical injury or a form of mental upset. Not all unpleasant personal experiences (such as fright, repulsion, or annoyance) are of sufficient magnitude to justify confinement to protect society therefrom. See Cross, 418 F. 2d at 1100. The legislature must ultimately determine the type of harm required before an individual can be deprived of his liberty.

Our legislature, in enacting section 1-104.5, determined that "threatening behavior" or "conduct that places another individual in reasonable expectation of being harmed" was of sufficient magnitude to deprive a mentally ill individual of his freedom. We hold those terms are impermissibly vague. "With regard to vagueness, then, due process is satisfied if *** the statute provides sufficiently definite standards for law enforcement and triers of fact that its applications do not depend merely on their private conceptions." Molnar, 222 Ill. 2d at 524, 857 N.E.2d at 226.

The plain language of section 1-104.5 arguably applies to the types of less serious harm described above--the type of harm that does not justify the deprivation of a fundamental liberty interest. See In re Dennis H., 2002 WI 104, ¶28, 255 Wis. 2d 359, 379, ¶28, 647 N.W.2d 851, 860, ¶28 (2002) ("A mental commitment provision is overly

broad only if by its terms it could reasonably be applied to commit mentally ill persons who are not in any way dangerous to themselves or others"). Under section 1-119(3), the State could reasonably petition to commit a mentally ill individual who stood on a public street and shouted racial slurs at a passerby. The State could feasibly argue, under section 1-104.5, that this conduct placed the passerby "in reasonable expectation of being harmed," albeit only psychologically harmed. Should the respondent satisfy the other requirements of section 1-119, he or she could be confined to a mental-health hospital against his or her will for such conduct. Although this may seem an extreme example, it tends to demonstrate that the magnitude of harm should be more narrowly defined. This statute, as written, does not preclude the entire gamut of psychological, emotional, or financial harm, regardless of severity. If the benefit to society of involuntarily committing this hypothetical individual is weighed against the severity of the loss of liberty, confinement, in this instance, seems unduly oppressive and unreasonable.

Applying this vague definition of "dangerous conduct" to various acts of a mentally ill individual impermissibly affords the State too much discretion. See Papachristou v. City of Jacksonville, 405 U.S. 156, 165-71, 31 L. Ed. 2d 110, 117-21, 92 S. Ct. 839, 844-48 (1972) (use of imprecise terms in vagrancy ordinance resulted in the finding that the ordinance was unconstitutional as it lacked sufficient standards that could result in arbitrary enforcement). Further, it poses a risk of arbitrary application to mentally ill individuals engaging in merely unusual or annoying behavior. Developments, 87 Harv. L. Rev. at 1257. What is considered unusual, annoying, harmful, or threatening behavior may vary from individual to individual, yet it all could satisfy the definition of "dangerous conduct" as currently provided by the amended statute. Given

the lack of sufficient guidance in the definition, the foreseeable result of arbitrary interpretation and application by the governmental authorities leads this court to conclude that the definition set forth in section 1-104.5 of the Mental Health Code (405 ILCS 5/1-104.5 (West 2008)) does not satisfy constitutional standards and must be declared void.

In addition, the new relaxed standard set forth in section 1-119(3), after applying the definition of "dangerous conduct" set forth in section 1-104.5, creates a problematic legal quagmire when analyzed in light of the procedural standards for the involuntary administration of psychotropic medications. It is widely understood that involuntary admission is completely independent from involuntary administration of medication. A patient, even after being involuntarily admitted to a hospital, retains the right to refuse medication. The trial court must, in a separate proceeding, decide whether to involuntarily administer psychotropic medications. See 405 ILCS 5/2-107.1 (West 2008). Such a decision rests upon whether treatment is "necessary to prevent the recipient from causing serious and imminent physical harm to the recipient or others." 405 ILCS 5/2-107(a) (West 2008). This standard remains unchanged. Therefore, a patient could conceivably be involuntarily admitted if he has deteriorated to the point that there is a possibility of future harm but, if he refuses medication, he is in the hospital unable to be treated.

This potential problem can be further demonstrated applying the example mentioned above. The mentally ill person standing on the street corner shouting racial slurs may have stopped taking his medication. His family has noticed his mental deterioration and has petitioned the court to involuntarily admit him for treatment

because they fear, and as a mental-health professional will testify, he will continue to suffer mental deterioration "to the point that [he] is reasonably expected to engage in dangerous conduct." Because "dangerous conduct" is defined as "threatening behavior or conduct that places another individual in reasonable expectation of being harmed," those passing by on the street have the potential of being harmed by the respondent's conduct. At the hearing, the trial court finds the standard of section 1-119(3), applying the definition set forth in 1-104.5, has been met and orders the respondent to be involuntarily admitted for treatment. However, under these facts, the State cannot prove that medication is necessary to prevent "serious and imminent physical harm" to the respondent or others in order to involuntarily treat this respondent. Under the less-stringent standards of the amended Mental Health Code, this respondent is ill enough to admit him against his will, but not ill enough to treat him against his will. Therein lies the problem.

This court recognizes the difficulty in creating a definition that sufficiently addresses the delicate balance between the State's interests and the individual's interests. The threshold must be narrowly tailored to ensure the commitment of only those individuals who are considered dangerous, yet broad enough to ensure that those who desperately need treatment can get it before his or her condition becomes significantly worse and treatment may be less successful. See A. Pfeffer, Note: "Imminent Danger" and Inconsistency: The Need for National Reform of the "Imminent Danger" Standard for Involuntary Civil Commitment in the Wake of the Virginia Tech Tragedy, 30 Cardozo L. Rev. 277, 297-98 (2008) (discussion of "imminent danger" versus "substantial risk" standards of dangerousness in commitment statutes; favoring the broader "substantial

risk" or "substantial likelihood" standards rather than narrower "imminent danger" standard).

We note that the Supreme Court has indicated that it is better for society to commit a non-mentally ill individual than allow a dangerous mentally ill individual to have freedom. Addington, 441 U.S. at 429, 60 L. Ed. 2d at 333, 99 S. Ct. at 1811 ("It cannot be said, therefore, that it is much better for a mentally ill person to 'go free' than for a mentally normal person to be committed"). However, the statutory definition of "dangerous conduct" as it currently provides would allow the involuntary commitment of individuals who pose no real threat to society.

Therefore, we hold that the definition of "dangerous conduct," as set forth in section 1-104.5 and referenced in section 1-119(3) of the Mental Health Code (405 ILCS 5/1-104.5, 1-119(3) (West 2008)), does not provide a sufficient standard to justify the involuntary hospitalization of a mentally ill individual. A more definite statutory categorization of anticipated danger is required to justify the State's action in involuntarily committing its citizens. As a result, we declare section 1-104.5 of the Mental Health Code (405 ILCS 5/1-104.5 (West 2008)) unconstitutionally vague and violative of the guarantees of substantive due process. To the extent that the judgment ordering respondent's involuntary commitment relied upon the definition of dangerous conduct in section 1-104.5, we vacate it as void.

In compliance with Supreme Court Rule 18 (210 Ill. 2d R. 18), we make clear the following: (1) the definition of "dangerous conduct" set forth in section 1-104.5 (405 ILCS 5/1-104.5 (West 2008)) is unconstitutional, (2) the statute violates the guarantees of due process set forth in the fifth and fourteenth amendments of the

- 23 -

United States Constitution, (3) we declare the statute unconstitutional on its face, (4) the statute cannot be reasonably construed in a manner that would preserve its validity, (5) the finding of unconstitutionality is necessary to the decision rendered herein, (6) we find no nonconstitutional grounds upon which the trial court's judgment could rest, and (7) the notice provisions of Supreme Court Rule 19 (210 Ill. 2d R. 19) have been satisfied, as the State has responded in these proceedings to respondent's constitutional challenge.

Vacated.

KNECHT and POPE, JJ., concur.