NO. 4-09-0553          Opinion Filed 5/20/11

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: CHARLES H., a Person Found | ) | Appeal from |
| Subject to Involuntary Admission, | ) | Circuit Court of |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 09MH540 |
| v. | ) | |
| CHARLES H., | ) | |
| Respondent-Appellant, | ) | |
| and | ) | |
| LISA MADIGAN, Attorney General of the | ) | Honorable |
| State of Illinois, | ) | Esteban F. Sanchez, |
| Intervenor-Appellee. | ) | Judge Presiding. |

---

JUSTICE POPE delivered the judgment of the court, with opinion.
Justices Appleton and McCullough concurred in the judgment and opinion.

**OPINION**

On July 20, 2009, Kim Waymack, an employee at St. John's Hospital, filed a

petition for involuntary admission against respondent, Charles H. On July 24, 2009, the trial

court found respondent to be mentally ill and subject to involuntary admission under section 3-

600 of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS

5/3-600 (West 2008)).

Respondent appeals, arguing (1) his appeal is not moot because it falls under the

collateral-consequences exception to the mootness doctrine; (2) the involuntary commitment

must be vacated because it was based on the statutory standard of "dangerous conduct," which

was found unconstitutional by this court in *In re Torski C.*, 395 Ill. App. 3d 1010, 1027, 918

N.E.2d 1218, 1233 (2009); (3) the commitment order must be reversed because the State failed to

submit a complete written dispositional report as required under section 3-810 of the Mental Health Code (405 ILCS 5/3-810 (West 2008)); and (4) the trial court erred by failing to consider less-restrictive alternatives in treatment.

## I. BACKGROUND

On July 20, 2009, Kim Waymack, an employee at St. John's Hospital, filed a petition for involuntary admission against respondent. The petition sought respondent's immediate hospitalization and alleged he was mentally ill and, because of his illness, he was (1) reasonably expected to engage in dangerous conduct which may include threatening behavior or conduct placing him or another in reasonable expectation of being harmed and (2) unable to understand his need for treatment and if not treated, was reasonably expected to suffer or continue to suffer mental or emotional deterioration, or both, to the point he would be reasonably expected to engage in dangerous conduct.

Additionally, the petition included allegations respondent (1) went to the emergency room because he wanted "to get a full examination," (2) had "stacks of papers in his room," (3) stated he was not on medication because "his mental health [was] in recovery," (4) has no family or friend support, and (5) entered the nurses' station screaming he was leaving while he waved papers at the hospital staff.

On July 24, 2009, the trial court held a hearing on the petition for involuntary admission. The State's first witness was Dr. Haojing Huang. Huang testified he was a psychiatrist employed at St. John's Hospital. Huang stated on July 19, 2009, respondent entered the St. John's emergency room and was very loud and demanding. He entered the nurses' station, waved papers at hospital staff, and asked to be immediately discharged. Because the nurses were

unable to control his behavior, they gave him an injection of Geodon to calm him down.

Additionally, Huang testified during his initial interview with respondent on July 20, 2009, respondent was very loud and threatening. Huang stated respondent pointed to a medical student and stated he was going to wipe the smirk off the student's face. He also pointed to a resident and threatened to "do something about it" if the resident continued to keep him in the hospital. Huang testified he eventually terminated the interview because he felt threatened by respondent.

Huang further testified respondent entered the nurses' station on July 21, 2009, and made incoherent demands. Huang testified the nurses were unable to calm respondent, and he believed security was called. Eventually, the nurses had to give respondent "I.M. Zyprexa" to calm him down. Huang testified another patient reported respondent mistreated female staff. The patient stated he would like to interfere and "take action into his own hands."

Huang diagnosed respondent with schizoaffective disorder, bipolar type. Huang noted respondent (1) currently experienced sleep deprivation at night; (2) constantly wrote and produced a lot of papers; (3) had stated he was in Springfield to get a full medical exam, to see God, and to address the state legislature; and (4) was very grandiose.

Huang concluded respondent was unable to understand his need for treatment, repeatedly stated he did not have a mental illness, and repeatedly refused any treatment. Huang further concluded respondent was reasonably expected to suffer or continue to suffer mental deterioration without treatment, and respondent was reasonably expected to engage in dangerous conduct as a result of the mental deterioration. Huang opined respondent was in need of hospitalization for the prevention of harm to himself or others, and hospitalization was currently

the least-restrictive treatment alternative. Huang testified a treatment plan had been formulated for respondent, and the treatment plan was admitted into evidence for dispositional purposes only.

Further, Huang recommended a state facility with the Department of Human Services, such as McFarland Mental Health Center, because respondent needed long-term treatment. Huang testified respondent was previously hospitalized at McFarland Mental Health Center, but respondent was unable to identify his outpatient psychiatrist and the medication he received.

On cross-examination, Huang testified respondent initially stated he walked from Alton, Illinois, to Springfield, Illinois. Huang testified respondent refused medication, and he had not received medication since July 21, 2009. He admitted respondent's condition had improved since he was admitted. He further admitted respondent had not physically harmed other patients or hospital staff. Additionally, he testified respondent acknowledged he was diagnosed with schizophrenia to emergency-room staff.

The treatment plan relied on by Huang and admitted into evidence by the State noted respondent (1) suffered from hallucinations, disorganized speech, and chronic self-neglect; (2) had a history of paranoid schizophrenia but was unable to remember the last time he was treated for his mental illness; (3) lacked support; and (4) was homeless. Further, the treatment plan (1) described both the short-term and long-term goals for respondent's treatment and provided a target date for the short-term goals, (2) stated respondent would be discharged when his psychotic symptoms were sufficiently reduced to where he could be treated on an outpatient basis, and (3) stated the discharge plan was uncertain but respondent may need longer-term

treatment.

After the State rested its case, defense counsel called respondent to the stand. Respondent testified he went to the emergency room because he accidently fell out of the back of a truck and was "bruised all up." He received treatment in Alton, Illinois, for his injuries, but his doctors believed he would receive better treatment in Springfield, Illinois. He testified he previously walked from Springfield, Illinois, to Alton, Illinois, but he rode the train for his current visit.

He testified he voluntarily went to the emergency room at St. John's Hospital to seek shelter and treatment for his injuries. He testified he experienced pain in his arm and feet because he "was being pursued" in Alton.

Respondent further testified he entered the emergency room and tried to gain the attention of the staff to let them know he was there "to be totally examined." He admitted he asked the staff to discharge him without medical advice because he was admitted voluntarily. He denied being loud and threatening during his initial interview with Huang. Instead, he claimed he was attempting to write out a form requesting a discharge against medical advice, and some of the medical students looked at him strangely. He also denied threatening to wipe the smirk off a medical student's face.

Further, respondent did not recall entering the nurse's station on July 21, 2009, and making demands until security was called. He testified he was in Springfield to relocate and "address the issues *** the doctor wanted [him] to address to the congress and to senators and representatives." He admitted he suffered from a mental illness, but he learned to "deal with *** [the] mental illness and to deal with others in the process." He further testified he "learned [he]

- 5 -

didn't need the drugs that [he] was *** allergic to or had adverse effects and which [he] had gone off."

On cross-examination, respondent testified he was discharged from the psychiatric unit at a hospital in Granite City, Illinois, on approximately July 8, 2009. He testified he went to the hospital in Granite City because he was being threatened at home, he stayed at the hospital for approximately one week, and he did not take any psychotropic medication.

After hearing closing arguments, the trial court noted respondent was "an eloquent and verbose individual who has made a good impression to the [c]ourt." The court further noted respondent was not sleeping, felt threatened, and "his behavior could cause others to react adversely and put himself and others in danger of harm." The court concluded respondent was suffering from a mental illness and was likely to engage in dangerous conduct.

Additionally, the trial court concluded respondent's condition would continue to deteriorate without treatment to the point he could engage in dangerous conduct. Although the court noted respondent denied his interactions with the hospital staff and medical students were dangerous or threatening, the court believed either he engaged in dangerous conduct and had not perceived it as dangerous or someone might perceive his conduct as dangerous and overreact.

The court ordered respondent committed to McFarland Mental Health Center for a period not to exceed 90 days. Although the written involuntary-commitment order filed on July 24, 2009, stated the petition for involuntary admission was dismissed, it ordered commitment as the least-restrictive treatment alternative available.

This appeal followed.

## II. ANALYSIS

A. Mootness

The trial court entered the commitment order on July 24, 2009, and limited the enforceability of the order to 90 days. The 90-day period has passed. As a result, this case is moot. Therefore, before we can address the merits of respondent's appeal, we must first determine whether any exception to the mootness doctrine applies. In his opening brief, respondent argues his appeal is not moot because it falls under the capable-of-repetition-yet-evading-review, the collateral-consequences, and the public-interest exceptions to the mootness doctrine.

On October 26, 2010, the State filed a motion to dismiss respondent's appeal as moot, arguing the capable-of-repetition-yet-evading-review and public-interest exceptions to the mootness doctrine no longer applied because section 1-104.5 of the Mental Health Code was repealed to remove the definition of "dangerous conduct." Pub. Act 96-1399, § 10 (eff. July 29, 2010) (2010 Ill. Legis. Serv. 3593, 3605 (West)) (repealing 405 ILCS 5/1-104.5 (West 2008)). Additionally, section 1-119 of the Mental Health Code was amended to change the involuntary-commitment standard. Pub. Act 96-1399, § 5 (eff. July 29, 2010) (2010 Ill. Legis. Serv. 3593, 3593-94 (West)) (amending 405 ILCS 5/1-119 (West 2008)). Therefore, the State argued respondent's appeal should be dismissed as moot unless respondent could show he has not been subjected to a previous involuntary-commitment order and has not been convicted of a felony.

On November 19, 2010, respondent filed a response to the motion to dismiss and agreed the capable-of-repetition-yet-evading-review and public-interest exceptions no longer applied but argued the case should not be dismissed as moot because the collateral-consequences exception applied. In particular, respondent argued the collateral-consequences exception

- 7 -

applied because the record does not indicate respondent has been subjected to a previous involuntary-commitment order or has been convicted of a felony. Respondent stated a petition for involuntary commitment was previously filed in September 2009, but the petition was dismissed and no involuntary commitment resulted from the filed petition. Therefore, respondent concluded the present involuntary commitment is the only known involuntary commitment against respondent, and respondent has no known felony convictions. On November 22, 2010, this court denied the State's motion to dismiss respondent's appeal as moot.

### B. Collateral-Consequences Exception

The collateral-consequences exception to the mootness doctrine allows a reviewing court to consider an otherwise moot case where the involuntary admission "could return to plague the respondent in some future proceedings or could affect other aspects of the respondent's life." *In re Val Q.*, 396 Ill. App. 3d 155, 159, 919 N.E.2d 976, 980 (2009). However, according to *In re Alfred H.H.*, 233 Ill. 2d 345, 362-63, 910 N.E.2d 74, 84 (2009), the collateral-consequences exception will not apply when a respondent has previously been involuntarily committed because any collateral consequences have already attached as a result of the prior commitments.

In this case, our review of the record does not indicate respondent has ever been subjected to a prior order for involuntary commitment. The July 24, 2009, involuntary commitment could potentially return to plague respondent in future proceedings or affect other aspects of his life. Accordingly, we find the collateral-consequences exception applies.

### C. Involuntary-Commitment Standards

Respondent argues the July 24, 2009, commitment order should be vacated

because it was based on an unconstitutional statutory standard. In particular, respondent argues he was committed based on the dangerous-conduct standard as defined in section 1-104.5 of the Mental Health Code (405 ILCS 5/1-104.5 (West 2008)), a statutory standard found unconstitutional by this court in *Torski C.*, 395 Ill. App. 3d at 1027, 918 N.E.2d at 1233. Respondent argues the commitment order should be vacated because (1) *Torski C.* found the statutory standard of "dangerous conduct" unconstitutional on both void-for-vagueness and substantive-due-process grounds, and (2) the dangerous-conduct standard is unconstitutional as applied to respondent because it permitted the State to confine respondent when he posed no threat to himself or others.

Further, respondent argues if the court finds the statute constitutional, (1) the commitment order must be reversed because the State failed to submit a complete written dispositional report as required under section 3-810 of the Mental Health Code (405 ILCS 5/3-810 (West 2008)), and (2) the trial court erred by failing to consider less-restrictive alternatives in treatment.

The State argues the court should analyze the constitutionality of section 1-119(1) of the Mental Health Code without regard to *Torski C.* because this section further defines the term "dangerous conduct" as "threatening behavior or conduct that places [respondent] or another individual in reasonable expectation of being harmed." 405 ILCS 5/1-119(1) (West 2008). Additionally, the State argues this court should depart from its holding in *Torski C.*

Further, intervenor, the Attorney General, argues respondent forfeited his constitutional argument because he failed to raise the issue in the trial court. On the merits, intervenor argues *Torski C.* should not be followed because (1) it failed to adopt a reasonable,

narrow construction of section 1-104.5 of the Mental Health Code (405 ILCS 5/1-104.5 (West 2008)) and (2) the decision did not limit itself to an analysis of the statute's constitutionality as applied to the facts of the case. Additionally, intervenor argues sections 1-104.5 and 1-119 of the Mental Health Code (405 ILCS 5/1-104.5, 1-119 (West 2008)) are not facially unconstitutional and not unconstitutional as applied to the facts of the case.

### 1. *Forfeiture of Constitutionality Argument*

First, respondent argues he has not forfeited his constitutional argument because a constitutional challenge to a statute can be raised at any time under *People v. Bryant*, 128 Ill. 2d 448, 454, 539 N.E.2d 1221, 1224 (1989). However, intervenor argues the court should not disregard respondent's failure to raise his constitutional argument in the trial court because *Bryant* does not say a party in a *civil* case may contest a statute's constitutionality at any time. Instead, intervenor argues this principle is limited to *criminal* cases as demonstrated in *People v. Guevara*, 216 Ill. 2d 533, 542, 837 N.E.2d 901, 907 (2005), and *People v. Wright*, 194 Ill. 2d 1, 23, 740 N.E.2d 755, 766 (2000).

According to the Illinois Supreme Court in *Bryant*, 128 Ill. 2d at 454, 539 N.E.2d at 1224, "a constitutional challenge to a statute can be raised at any time." However, subsequent cases have held a constitutional challenge to a *criminal* statute may be raised at any time. See *Guevara*, 216 Ill. 2d at 542, 837 N.E.2d at 907; *Wright*, 194 Ill. 2d at 23, 740 N.E.2d at 766. Additionally, in *Premo v. Falcone*, 197 Ill. App. 3d 625, 633, 554 N.E.2d 1071, 1077 (1990), the court held "[q]uestions not raised in the trial court, including constitutional issues, are waived and may not be raised for the first time on appeal."

In the present case, a finding respondent has forfeited his constitutional argument

could result in this court affirming his involuntary commitment even though the commitment might have been based on an unconstitutional statutory standard. Additionally, if the involuntary-commitment order is upheld, this could preclude respondent from appealing subsequent involuntary-commitment orders under the collateral-consequences exception of the mootness doctrine. See *Alfred H.H.*, 233 Ill. 2d at 362-63, 910 N.E.2d at 84.

Further, "[i]t is well established that the imposition of involuntary mental-health services implicate an individual's substantial liberty interests." *Torski C.*, 395 Ill. App. 3d at 1017, 918 N.E.2d at 1225. Because the imposition of an involuntary-commitment order implicates substantial liberty interests, and forfeiture is a limitation on the parties but not the court, we choose to address the issue raised in this appeal. See *In re Joseph P.*, 406 Ill. App. 3d 341, 347, 943 N.E.2d 715, 721 (2010); *Our Savior Evangelical Lutheran Church v. Saville*, 397 Ill. App. 3d 1003, 1028, 922 N.E.2d 1143, 1163 (2009).

### 2. *Constitutionality of Sections 1-104.5 and 1-119*<br>*of the Mental Health Code*

Next, respondent argues the July 24, 2009, commitment order should be vacated because his commitment was based on the dangerous-conduct standard as defined in section 1-104.5 of the Mental Health Code (405 ILCS 5/1-104.5 (West 2008)), a statutory standard found unconstitutional by this court in *Torski C.*, 395 Ill. App. 3d at 1027, 918 N.E.2d at 1233. Respondent argues the commitment order should be vacated because (1) *Torski C.* found the statutory standard of "dangerous conduct" as defined in section 1-104.5 and referenced in section 1-119(3) of the Mental Health Code (405 ILCS 5/1-104.5, 1-119(3) (West 2008)) to be unconstitutional on void-for-vagueness and substantive-due-process grounds; (2) the July 24, 2009,

- 11 -

commitment was based on section 1-119(1), which mirrors section 1-104.5; (3) the court is unable to construe section 1-119(1) in a manner to survive constitutional scrutiny; and (4) the dangerous-conduct standard is unconstitutional as applied to respondent because it permitted the State to confine respondent when he posed no threat to himself or others.

The State argues the court should analyze the constitutionality of section 1-119(1) of the Mental Health Code (405 ILCS 5/1-119(1) (West 2008)) without regard to *Torski C.* The State argues *Torski C.* is inapplicable to the present case because section 1-119(1) further defines the term "dangerous conduct" as threatening behavior or conduct placing the mentally ill person or another in reasonable expectation of being harmed. Additionally, the State argues the court should depart from *Torski C.* because (1) *Torski C.* ignored section 3-811 of the Mental Health Code (405 ILCS 5/3-811 (West 2008)), which allows hospitalization only where appropriate; (2) section 1-119(1) of the Mental Health Code (405 ILCS 5/1-119(1) (West 2008)) should be interpreted as only protecting the mind and body from threat of actual damage or injury; and (3) the record demonstrates sufficient dangerousness to support the constitutionality of the statutory language as applied to respondent's commitment.

Further, intervenor argues (1) *Torski C.* should not be followed because (I) *Torski C.* failed to adopt a reasonable, narrowing construction of section 1-104.5 of the Mental Health Code (405 ILCS 5/1-104.5 (West 2008)), and (ii) the decision did not limit itself to an analysis of the statute's constitutionality as applied to the facts of the case; and (2) sections 1-104.5 and 1-119 of the Mental Health Code (405 ILCS 5/1-119, 1-104.5 (West 2008)) are not facially unconstitutional and not unconstitutional as applied to the facts of respondent's case.

The involuntary-commitment order was entered in this case pre-*Torski C.* on July

- 12 -

24, 2009. Therefore, respondent was committed based on the statutory standard of "dangerous conduct" held unconstitutional in *Torski C.* In *Torski C.*, 395 Ill. App. 3d at 1019, 918 N.E.2d at 1227, the third prong of section 1-119 was the only subsection at issue. Section 1-119(3) of the Mental Health Code (405 ILCS 5/1-119(3) (West 2008)) defined a person subject to involuntary admission as follows:

"A person with mental illness who, because of the nature of his or her illness, is unable to understand his or her need for treatment and who, if not treated, is reasonably expected to suffer or continue to suffer mental deterioration or emotional deterioration, or both, to the point that the person is reasonably expected to engage in dangerous conduct."

Further, the term "dangerous conduct" was defined in section 1-104.5 of the Mental Health Code (405 ILCS 5/1-104.5 (West 2008)), and it stated as follows:

" 'Dangerous conduct' means threatening behavior or conduct that places another individual in reasonable expectation of being harmed, or a person's inability to provide, without the assistance of family or outside help, for his or her basic physical needs so as to guard himself or herself from serious harm."

However, in the present case, the petition for involuntary commitment sought immediate hospitalization of respondent and alleged he was mentally ill and, because of his illness, he was (1) reasonably expected to engage in dangerous conduct which may include threatening behavior or conduct placing him or another in reasonable expectation of being

- 13 -

harmed and (2) unable to understand his need for treatment and if not treated, was reasonably expected to suffer or continue to suffer mental or emotional deterioration, or both, to the point he would be reasonably expected to engage in dangerous conduct. This language mirrored the involuntary-commitment standard set forth in section 1-119(1).

Section 1-119(1) of the Mental Health Code (405 ILCS 5/1-119(1) (West 2008)) defined a person subject to involuntary admission as follows:

"A person with mental illness and who because of his or her illness

is reasonably expected to engage in dangerous conduct which may

include threatening behavior or conduct that places that person or

another individual in reasonable expectation of being harmed[.]"

In *Torski C.*, 395 Ill. App. 3d at 1027, 918 N.E.2d at 1232-33, we held the term "dangerous conduct" was an insufficient standard to justify the involuntary commitment of a mentally ill individual because it was unconstitutionally vague and violated substantive due process. The term "dangerous conduct" as defined in section 1-104.5 of the Mental Health Code (405 ILCS 5/1-104.5 (West 2008)) was declared unconstitutionally vague because "it pose[d] a risk of arbitrary application to mentally ill individuals engaging in merely unusual or annoying behavior." *Torski C.*, 395 Ill. App. 3d at 1025, 918 N.E.2d at 1231. Additionally, this court determined "the statutory definition of 'dangerous conduct' as it currently provides would allow the involuntary commitment of individuals who pose no real threat to society." *Torski C.*, 395 Ill. App. 3d at 1027, 918 N.E.2d at 1232.

Contrary to the position of the State and intervenor, we will not consider respondent's constitutional arguments without regard to *Torski C.* because we believe the *Torski C.*

- 14 -

holding was correct. In support of our holding in *Torski C.*, we note the legislature repealed section 1-104.5 of the Mental Health Code (Pub. Act 96-1399, § 10 (eff. July 29, 2010) (2010 Ill. Legis. Serv. 3593, 3605 (West)) (repealing 405 ILCS 5/1-104.5 (West 2008))). Additionally, the legislature amended section 1-119 of the Mental Health Code (Pub. Act 96-1399, § 5 (eff. July 29, 2010) (2010 Ill. Legis. Serv. 3593, 3593-94 (West)) (amending 405 ILCS 5/1-119 (West 2008))) to remove any references to "dangerous conduct" and change the commitment criteria under section 1-119.

Further, although the State argues section 1-119(1) is distinguishable from section 1-119(3) because 1-119(1) states "dangerous conduct" includes threatening behavior or conduct placing the mentally ill person or another in reasonable expectation of being harmed, we note this language mirrors the statutory definition of "dangerous conduct." Therefore, section 1-119(1) is not distinguishable because it incorporates the definition of "dangerous conduct" held unconstitutional by this court.

Because respondent's involuntary commitment was based on the unconstitutional statutory standard of "dangerous conduct," the trial court's commitment order must be vacated. Accordingly, the court's July 24, 2009, involuntary-commitment order is vacated, and we need not address respondent's section 3-810 and least-restrictive-treatment arguments.

III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and vacate the order of involuntary commitment.

Reversed and vacated.