# Illinois Official Reports

## Supreme Court

---

### *People v. Holt*, 2014 IL 116989

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MARY M. HOLT, Appellant. |
| Docket No. | 116989 |
| Filed | November 20, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | An attorney did not render ineffective assistance of counsel by arguing that his client was unfit for trial where he believed that to be the case and the evidence supported that conclusion, even though the client believed otherwise. |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Kendall County, the Hon. John A. Barsanti, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Thomas A. Lilien and R. Christopher White, of the Office of the State Appellate Defender, of Elgin, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Eric C. Weis, State's Attorney, of Yorkville (Carolyn E. Shapiro, Solicitor General, and Michael M. Glick and Matthew P. Becker, Assistant Attorneys General, of Chicago, of counsel), for the People.

Justices

JUSTICE KARMEIER delivered the judgment of the court, with opinion.
Chief Justice Garman and Justices Freeman, Thomas, Kilbride, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1    The issue presented in this appeal is whether defense counsel rendered ineffective assistance when counsel failed to argue defendant's position that she was fit to stand trial, and she was ultimately found unfit. The appellate court held that defense counsel was not required to defer to defendant's position. 2013 IL App (2d) 120476. We allowed defendant's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. July 1, 2013)) and now affirm the judgment of the appellate court.

¶ 2                                    BACKGROUND

¶ 3    As a result of conduct alleged to have occurred on November 7, 2010, defendant, Mary Holt, was charged in the circuit court of Kendall County with resisting a peace officer and disorderly conduct. With respect to the former charge, it was alleged that defendant resisted Officer Kaleta in the execution of an authorized act in the performance of his official duties in that she resisted as the officer attempted to detain her and place her in handcuffs. The disorderly conduct charge was based on the allegation that defendant "knowingly threw 2 eggs on to the driveway of 2669 Jenna Circle [in Montgomery, Illinois] in such an unreasonable manner as to alarm and disturb Kevin Kartheiser and his 6 year old daughter and provoke a breach of the peace."

¶ 4    In February of 2011, defendant, who was then represented by retained counsel, entered a negotiated guilty plea to the charge of resisting a peace officer, and the other charge was nol-prossed. Pursuant to the plea agreement, defendant was sentenced to a 12-month term of probation. In addition to standard conditions of probation, defendant was ordered not to enter upon the property of 2669 Jenna Circle in Montgomery, Illinois, and she was required to continue counseling with psychologist Robert Lewis and to provide documentation of treatment to court services. The court twice admonished defendant that the plea agreement involved a "conviction." On the second occasion, the court stated: "This is a conviction for

that offense. Is that your understanding of the agreement?" Defendant responded: "Yes, Your Honor."

¶ 5    On March 9, 2011, defendant filed a *pro se* motion to vacate the guilty plea and resulting judgment, stating, *inter alia*, that she "was told there would be no conviction," that she "never had the chance to testify," and that "the guilty plea could seriously injure the Career of the Defendant." Defendant requested the appointment of the public defender.

¶ 6    In response, on April 19, 2011, defendant's previous counsel, Richard Claahsen, filed a motion for leave to withdraw. Therein, counsel stated that the case had been substantially resolved; however, counsel noted that defendant "continue[d] to petition the court, appeal her case, or otherwise attempt to take legal action, without the advice of her attorney" and "against the advice of [her] attorney."

¶ 7    On May 17, 2011, defendant filed another *pro se* motion to withdraw her guilty plea, representing that she had done so after consultation with her previous counsel. In her motion, defendant claimed she was told by an attorney that there would be no conviction as a result of her guilty plea and the misdemeanor involved was "the lowest class charge." Defendant alleged she had been advised by counsel *not* to accept the State's offer. An exhibit attached to the motion appears to support the allegation that defendant pled guilty against the advice of counsel. In a letter dated January 27, 2011, counsel stated that he had received an offer from the State, and that he was duty-bound to convey it, but he advised: "I do not think that you should accept it."

¶ 8    The circuit court granted Claahsen leave to withdraw, granted defendant's motion to withdraw her guilty plea, and appointed the public defender to represent her.

¶ 9    The next day, May 18, 2011, defendant filed a *pro se* "Petition to Quash the elements, and the statements, in the police report *** written by officer # 56." The allegations of defendant's petition offer insight into her thinking during the period pertinent to this appeal; hence, we recite some of them here. Defendant stated that the police report "was tampered and not the actual location of record, and further shows police brutality." "The Sergeant on Record, Diaz, stated that the Officer # 56 will be under surveillance." "That new authority stated, 'the Defendant suffered enough wrath, from the incident.' " Defendant suggested that the officer's report "does not match the video and therefore is false or edited tampered and made at a later date." Specifically, defendant charged that "[c]ertain clothes in video was not what the innocent civilian [defendant] wore." Defendant explained that she was in Kendall County "to find her missing children," who were apparently in the custody of her estranged husband. She complained that the police report did not take those circumstances into account because the original complainant—presumably Mr. Kartheiser—was not aware of the circumstances. According to the defendant, "the person Kevin; NEVER submitted ANY written report, therefore the officer could be sanctioned for illegal reporting techniques." In further support of her "petition to quash," defendant opined "the report is wrong! The reporting person told ½ lies." She continued:

> "The person, Kevin, allegedly made a verbal complaint, for the Defendant talking to the child, of the man at the property. This call to the station, gave further NO GROUNDS, to falsely detain, threaten and injure the defendant, and innocent civilian. This caused a false arrest and false report.

*  *  *

The Defendant, Ms. Holt, gave Full Compliance, and this incident caused her 100's of dollars for medical expenses for injury, as noted, she did not resist. Nor does she ever drink, as this officer failed to comply with standard regulations by reading Miranda rights. Officer Number #56, failed to follow standard protocol."

¶ 10    On June 9, 2011, defendant was charged with a new offense as a result of conduct allegedly occurring on that date. Defendant was charged with criminal trespass to residence insofar as defendant "knowingly and without authority entered a residence located at 2419 Montclair Lane in Montgomery, Illinois." She was given a notice to appear in court on June 21, 2011.

¶ 11    The record indicates that, on June 21, 2011, appointed counsel filed a motion for discovery on behalf of defendant, and defendant filed her own motion for discovery *pro se.* In her *pro se* motion, defendant stated at the outset that she had been falsely charged and requested, *inter alia*, the following: (1) any "statement(s) of Confession," or evidence from the complaining person; (2) "Request for the Children at the Residence, who need to be subpoenaed for WITNESS, who were afraid of the person, who made an allegation"; and (3) "History of the prior Perjury that Mr. Holt has committed upon the Court, for (7) yrs upon the Court (Fraud)." Defendant prefaced her signature with the phrase, "Under the Almighty Hand of His graciousness," and followed her signature with the title, "Certified Educator."

¶ 12    On the same date defendant filed two other documents, at least one of which was referenced in her *pro se* motion for discovery. That *pro se* document, according to a file stamp thereon, was filed by defendant on August 7, 2007, in the circuit court of Peoria County. The document, entitled "Petition for Emergency Return of Children," evinced defendant's considerable emotional upset over the custody of her children, whom she described as "missing." She appeared to concede that the children's father, Brad Holt, rightfully had temporary custody of the children, but she alleged he had "no right to take them from the Jurisdiction without telling anyone for one month where they are." She stated: "50+ professional other people signed a petition, stating I should get FULL custody." She requested a meeting with the judge, the "presiding counselor" [psychologist Lewis], the "Elder of the Congregation," and "PD Captain" Dean Kennedy. She claimed that "Dean has authorized the emergency meeting."

¶ 13    The third document filed by defendant on June 21 was entitled, simply, "Complaint." In that document, defendant stated:

"The Following REPORT Number 11-5391 is Absolutely FALSE!!!

The man at location 2419 Montclair, age 46yr and Birthdate 3-22-65, with Sos Security Number ***[1] has LIED to the Police, the STATE, and the Family, in multiple occasions.

Response and Supplemental Report available of the addiction of violence, previous of Brad J. Holt, who is under surveillance."

Defendant again signed with the title "Certified Educator" and added this postscript: "The Case in another Court District Peoria; Pending Custody Battle."

¶ 14    When the parties convened in court on June 21, 2011, with respect to defendant's consolidated misdemeanor cases, the court first appointed the public defender's office to

---

[1]We have deleted the Social Security number that appeared in the referenced document.

represent defendant on the new charge, then advised her of the charged offense and possible penalties. Defendant pled not guilty.

¶ 15    Immediately thereafter, the prosecutor expressed her doubt as to defendant's fitness and requested a court-ordered fitness evaluation prior to any further proceedings. Defense counsel indicated he had no objection. The report of proceedings indicates that defendant made some comment at that juncture, which the reporter found unintelligible. The following colloquy ensued:

"THE COURT: Ma'am, we don't know anything about that till we do an interview. And that will make some determination and may or may not show that. So—

THE DEFENDANT: I have no finances for that nine hundred dollar evaluation.

THE COURT: Court will pay for it, ma'am, court will pay for it.

THE DEFENDANT: It's irrelevant at this point. I just need to continue to work. I have a pending court date in a custody battle.

THE COURT: Okay. I'm going to direct that you present yourself to the public health—where do we do it here?

THE PROSECUTOR: Yes, Judge. Kane County Diagnostic Center.

* * *

THE DEFENDANT: My car engine just failed, two engines. I have no way to get there. This week two entire engine failures.

THE COURT: Okay.

THE DEFENDANT: I'm not from this district. I really—

THE COURT: Where do you live, ma'am?

THE DEFENDANT: East Peoria, Peoria area. And I have a psychologist there named Robert E. Lewis, he does these kind of evaluations. He can be contacted today. And he would be affordable, he'd be a lot less money.

THE PROSECUTOR: The State wants it done at the Kane County Diagnostic Center. It's a fitness eval, not a psych eval.

THE COURT: All right. That's what it is, ma'am. It's a fitness. We need a different type of doctor for that.

* * *

THE DEFENDANT: I can't be back in this district until six weeks.

THE COURT: Well, you need to get in there before then, ma'am, to get things started. It takes time to do the interview and write the report. So it isn't only your schedule, it's their case load and things like that.

* * *

THE DEFENDANT: We're not gonna be in this courtroom until August, according to the schedule, until the middle of August. We've got pending cases in July in a different county.

THE COURT: Well, now you got these cases here, ma'am. You're gonna have to comply with the order.

THE DEFENDANT: All I can do is try. I need to work because I have no money coming in. My daughter was raped.

THE COURT: Okay.

THE DEFENDANT: I demand making this complaint. This file is a reply to the complaint. But the police—

THE COURT: Ma'am, work with your lawyer. It's becoming more evident that you need this evaluation."

The order for a fitness evaluation, entered June 21, 2011, indicates that defendant's *pro se* motion for discovery was withdrawn.

¶ 16 The next day, defendant filed a *pro se* motion to "vacate the requirement for fitness testing." Therein, defendant alleged: (1) there was "no necessity or basis"; (2) "Defendant required/counsel attorney Rich Claahsen"; and (3) "Defendant is a College Degreed Grad and CURRENT Certified Educator in Illinois, <u>able</u> to <u>man</u>age <u>cou</u>rt <u>pro</u>ceedings. (attachment)" Defendant attached her resume. Defendant's motion was denied on July 7, 2011.

¶ 17 On September 29, 2011, prior to completion of the evaluation, defendant filed another *pro se* document, purporting to be an affidavit, seeking a continuance of the case. In that document, defendant indicated that she could not complete her fitness evaluation by the court-ordered deadline, "unless a miracle happens." She stated: "We are asking for a CONTINUANCE, till My attorney on record Dan Harrod, from county, says I have permission to leave the Jurisdiction where I am from." What followed were rambling accusations that "the opposition" had filed "false charges," had made "allegations that are PERJURY ON THE COURT," and had "[lied] to the sheriff[.]" Defendant suggested that proof of those accusations would come from her Peoria County litigation: "We can't report the Evidence from these Findings to the Kendall Court or to authorities involved easily without the expert testimony of accurate witnesses, such as the attorneys. We will bring AN Order from the Peoria Court, with vital back records, that prove the. And the hearing is set for Nov 14th but we hope to submit notice sooner." Defendant concluded with the following:

"WHEREFORE, since the STATE LAWS suggest THAT while another County COURT, has STATED THAT THEY HAVE CURRENT JURISDICTION OVER the PERSON(S) involved, with the Case, being my case record was corrupted, by false pleading(s) on 6/27/05.

That there are cases filed take PRECIDENCE, and the Judge Ordered that I must keep working on the case in Peoria, as being the case file is 00-D-598, until authority says I can submit information to Kendall County.

That the person(s) involved with this case; Brad Holt and Phil Pollock Counsel, filed FALSE CRIMINAL CHARGES, has been CAUGHT on 9/26/11; and may be PROSECUTED for violating the State Law(s).

WE ARE ASKING THE COURT, to freeze the <u>KENDALL CASE, till NOV</u> 15th, since the PEORIA CASES TRUE disposition, has further EVIDENCE that will Cause the false charges to be Vacated, against the Defendant. Further, ALL the Pleadings, in the State, and filings after this date of 6/27/05 made by Brad Holt or Phil Pollock, will be considered [MOOT] and they will be prosecuted.

With all Due Respect and Hope to prove utmost gratitude.

- 6 -

Mary Holt-Gruenhagen"

The record indicates that, on the motion of the defendant, an order was entered October 6, 2011, continuing the case to October 20, 2011.

¶ 18    October 6, 2011, was also the completion date of the fitness evaluation. Clinical psychologist, Timothy Brown, performed the evaluation and authored the report.

¶ 19    Brown noted that he had difficulty obtaining even basic historical personal information from defendant. He observed that her thinking was marked by loose associations and a flight of ideas. She would respond to questions in a focused manner, but would quickly veer off into elements that had little to do with the original query. Brown also noted that defendant used language in a peculiar manner. For example, she told him her "parents raised us [her siblings and herself] like a library." With respect to this portion of the evaluation, Brown stated:

> "As a consequence of Ms. Holt's thinking difficulties, I was unable to obtain a coherent and reliable personal history of her. She was cooperative with the requirements, but unable to harness her thoughts to cogently provide answers."

¶ 20    Brown *was* able to ascertain that defendant had been married, though he could not determine whether she was then divorced. He learned that she had two children whom she had not seen in several months, but he found her explanation as to why she did not have custody confusing. Brown's report indicated that defendant "has a positive psychiatric history," and that, in her twenties, she was directed to seek consultation with a mental health professional. He noted she was "possibly prescribed Lithium which she refused to consider taking."

¶ 21    Brown referenced the police report pertinent to defendant's pending resisting charge and thus provided some insight into the State's version of events. According to that report, the officers responded to a "suspicious vehicle complaint." Defendant supposedly went to the complainant's address, gave the complainant's daughter a video cassette, and brought a carton of eggs "as a gift." When officers in full uniform confronted her, defendant allegedly told them she did not know who they were and refused to exit her vehicle. When she subsequently did, the reporting officer claimed she stated "she was going to cast the devil out of" the officer. Then, according to the report, defendant resisted arrest.

¶ 22    In his evaluation, Brown found that defendant was hesitant to admit any negative consequences that might be associated with her actions or behavior, and she was quick to believe that she was being treated inequitably and that there was a concerted effort by others to undermine her best interests. He found her responses in the competency screening test were "overly personal" and he noted "she was unable to establish and maintain objective distance." Brown determined: "Her personal investment precludes her from objective detachment and her emotional reactions interfere with her ability to observe[,] recollect and recall facts relevant to her case." Defendant obtained a score of 14 on the competency screening test; a score below 20 was considered "problematic" in terms of an individual's understanding of the roles and functions of court personnel.

¶ 23    Brown characterized defendant as a "bright woman" with "little capacity to think with either precision or focus." He concluded:

> "Her disordered thinking is [a] sign of mental illness and a formal thought disorder. She has a limited understanding of the roles and functions of the participants in a

criminal proceeding. *** She experiences a flight of ideas in which she hops from topic to topic in such a personalized manner that she inaccurately perceives what most consider to be objective reality. Ms. Holt has limited insight into the nature of her problems and does not believe she has a mental illness of such severity as to warrant psychiatric intervention and medication. *** Based on the findings from this assessment, to a reasonable degree of psychological certainty, I believe Ms. Holt is unfit to stand trial."

¶ 24    Brown believed defendant could be restored to fitness within one year, and recommended that she be referred to the Department of Human Services (DHS) for a determination of whether she would require inpatient treatment or could be restored to fitness on an outpatient basis.

¶ 25    On October 20, 2011, defendant appeared in court with her appointed counsel. Counsel informed the court that he had consulted with defendant about the results of Brown's evaluation and it was their position, at that time, not to stipulate to the results of the evaluation. The defense requested a fitness hearing before the court, rather than a jury.

¶ 26    On November 29, 2011, a week before the scheduled fitness hearing, defense counsel filed a "Motion for Appointment of Independent Fitness Expert of Defendant's Choosing and Motion to Continue." Therein, counsel suggested, pursuant to section 104-13(e) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/104-13(e) (West 2010)), that defendant was "entitled to" the appointment of a qualified expert of her choosing to perform a fitness evaluation independent of the one initially performed. Counsel requested the appointment of Dr. Robert Lewis and the authorization of a $500 fee.

¶ 27    Defendant's motion was ultimately denied on January 10, 2012. The court ruled, based upon *People v. Russell*, 385 Ill. App. 3d 468 (2008), that a defendant charged with a misdemeanor is not entitled to have the county pay for an additional, independent fitness evaluation.

¶ 28    On March 2, 2012, the court and parties convened for defendant's fitness hearing, with Dr. Brown in attendance to testify. At that time, defense counsel announced that defendant had changed her mind and wished to have her fitness hearing before a jury, rather than the court. The matter was rescheduled for April 11, 2012.

¶ 29    The case was ultimately called for a jury trial on April 16, 2012. The record shows that defendant was represented by two assistant public defenders. The State advised the court at the outset that it would not be able to meet its burden of proving defendant fit, and then inquired whether the "subsequent issue of whether or not the defendant can be restored to fitness, would *** go before [the court] or before the jury." Defense counsel advised the court that he would move for a directed verdict if the State failed to meet its burden of introducing sufficient evidence of defendant's fitness and, if that motion were granted, *the court* should make the determination as to whether the defendant could be restored to fitness within one year. The court adopted defense counsel's position.

¶ 30    After jury selection, the parties gave brief opening statements. The State acknowledged that it would be unable to meet its burden of proving defendant fit to stand trial. Defense counsel, in his opening statement, took that position as well.

¶ 31    The State then called Dr. Brown to testify. Brown testified consistently with the report he had filed. His testimony was interrupted at one point, as the record indicates:

"THE COURT: I'm gonna ask that the doctor step out for a moment, please.

(Witness excused.) (Whereupon, the following proceedings were had out of the hearing and presence of the jury:)

THE COURT: For purposes of the record, I would like to point out that while—for the last maybe 15 or 20 minutes, I noticed the defendant to be very, very apparently upset, trying to communicate with her lawyers in a very, very animated way.

I can hear some of what's being said by the defendant. I can't hear what the lawyers are saying. And I notice that the jury is paying quite a bit of attention to the actions of the defendant as this is going on, taking away, of course, their attention to the witness, but then also the idea that they are observing her behavior.

Miss Holt, can you hear me?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You understand if you're acting out, if you are acting in a way which attracts attention of the jury to you, appearing very upset, it looked to me that you were very animated and very upset, and speaking loudly enough for me to hear, that can have an effect on the jury maybe that you don't want.

THE DEFENDANT: Right.

THE COURT: You might be affecting their opinion of you with your actions, which are not evidence of anything at this point in time. They're not presented as evidence.

I don't want you to speak to me, I want you to talk to your lawyers at this point. I want to advise you that I can't have that happen, continue to happen here in the courtroom.

I don't mind you talking to your lawyers, I don't mind you—telling them what you want to say to them. But I need you to do it quietly, I need you to do that in a manner which doesn't attract attention from the jury to what you're doing. Do you understand?

THE DEFENDANT: I need to take—

THE COURT: Let me finish. Let me finish.

(Overlapping conversation.)

THE DEFENDANT: It's about his—the statements are all lies.

DEFENSE COUNSEL: Stop, stop.

THE COURT: Okay. This is the part I'm speaking of, Miss Holt.

(Overlapping conversation.)

You need to control yourself for a moment. If you can't control yourself when the jury is in the jury box, you can't control your behavior, I'm gonna—I may be forced at some point in time to remove you from the room, so as to—just to stop the jury from drawing a conclusion which may be unwarranted in this case. Do you understand?

THE DEFENDANT: Yes.

THE COURT: So, I understand what your position is, what they're saying is not true. I'm not saying you can't even have that, you can have that position.

But what I'm telling you is when you're acting out in a way that's observable by the jury, you can taint how they view you, I don't want that to be the record in this case. I want it to be decided on evidence.

So, I need you to relax. If I have to stop this again, I'm gonna—I'm gonna consider moving you out of the room and putting you in another area while we hear the testimony. Do you understand?

THE DEFENDANT: Yes, Your Honor. But my attorney can object if we—he has no evidence of the statements. He has no taped verification, he has no report.

THE COURT: Okay. Stop, stop, stop. Your attorney is trained—both of your attorneys are highly trained and highly competent in this matter. You need to trust them and do what they're gonna do. You can still communicate with them if you want. I'm not telling you you can't communicate with them. And I'm not telling you you could ask them to do something.

I'm telling you you're gonna have to control yourself and let them make those decisions at that point. All right?

THE DEFENDANT: Could we have five minutes in the room just so—

THE COURT: No, you can't. I'm gonna bring back the jury.

(Overlapping conversation.)

THE DEFENDANT: So, I can't talk to them here?

THE COURT: So you want five minutes to speak to them about something?

THE DEFENDANT: Yes.

THE COURT: Here's what I'm gonna do. Listen to me closely. I'm gonna give you five minutes. We're gonna come back in here and we're gonna bring the jury back in. And I don't want to see any further acting out, all right?

THE DEFENDANT: That's fine.

THE COURT: All right. Take five minutes."

Thereafter, the jury was returned to the courtroom, and Brown's testimony resumed.

¶ 32     On cross-examination, defense counsel first asked Brown about the qualifications of the intern—a graduate student—who administered "objective psychological testing" to defendant and others. Brown noted that the graduate student was working on her doctorate at the time and did ultimately receive her doctorate. He testified to her qualifications to administer the test, and spoke to her training and experience in test administration. After that line of questioning, counsel then asked Brown about the environment in which defendant was given the objective test, establishing that the setting was appropriate and generally free from distractions, such that a reliable result was obtained. In questioning thereafter, counsel tried to ascertain whether Brown might have been unduly influenced, prior to his interview with defendant, by the results of the objective test. Brown responded: "No. *** Because again, what I try to indicate when I talked before is it's not just testing that says yes, this is a problem or no, it's not a problem. It's everything." Brown then referenced other elements that he considered in reaching his conclusions. Brown said he also noticed a consistency in defendant's behavior when he observed her prior to the interview and later in court.

¶ 33      After Brown's testimony, the State rested. Defendant moved for a directed verdict on the issue of fitness, noting that the State had failed to meet its burden of proving defendant fit to stand trial. The State conceded as much. The court granted the motion, and dismissed the jury.

¶ 34      The court and parties then turned to the issues of whether defendant could be restored to fitness within one year and, if so, what setting would be required to accomplish that result. The State recalled Dr. Brown who reaffirmed his opinion that defendant could be restored to fitness within one year. One significant factor in Brown's assessment was that "she's been able to, as far as I can tell, function outside of a hospital setting or psychiatric facility for quite some time." He nonetheless believed that defendant needed treatment, and he recommended an evaluation for "inpatient treatment," expressing the view that defendant "would be reluctant to take medicine and reluctant to avail herself of that kind of remedy or treatment." Brown thought it was unlikely that defendant could be restored to fitness on an outpatient basis.

¶ 35      In defense counsel's cross-examination, counsel asked questions obviously intended to establish support for an argument that defendant might be treated on an outpatient basis. To that end, counsel successfully emphasized that defendant had functioned outside of a hospital setting for the past 20 years. When counsel attempted to broach, more directly, the possibility of outpatient treatment, the following exchange took place:

      "DEFENSE COUNSEL: "[W]hen you stated—evaluated for inpatient treatment, are you stating essentially that inpatient treatment is the only way or there is a possibility that she might—

      BROWN: What I'm suggesting, DHS ultimately decides where she gets treatment. I'm saying that my opinion is that she's not gonna get restored on an outpatient basis. DHS is the agency that decides that, not me."

¶ 36      Defense counsel then changed course and obtained Brown's affirmation that defendant had been willing to cooperate through the process of the fitness evaluation, she had just been incapable of doing so.

¶ 37      On redirect examination, Brown clarified that it was his recommendation that defendant be "remanded to custody" for an evaluation to determine whether her treatment would be on an inpatient or outpatient basis. Brown did not reject, out of hand, the notion that defendant, if not remanded to custody, might comply with DHS in creating a treatment plan, but he did state that he thought it might take "a long time" and that "[i]t would be difficult to get her to cooperate."

¶ 38      When defense counsel was given the opportunity to argue treatment options, counsel argued forcefully for outpatient treatment. Counsel noted, first, that section 104-17 of the Code states, if a defendant is eligible to be or has been released on bail or on his own recognizance, the court shall select the least physically restrictive form of treatment therapeutically appropriate. Counsel disagreed with Brown's opinion that inpatient treatment was the only way defendant would be restored to fitness. Counsel underscored Brown's testimony that defendant was cooperative during the evaluation process. With an apparent nod to the criteria for involuntary commitment, counsel observed there was no testimony that defendant was a danger to herself or anyone else. Counsel argued: "[I]t's going to be difficult, in my opinion, to determine the least restrictive form of therapy consistent with the

treatment plan that at this point does not exist." Defense counsel contended that defendant should not be remanded to custody, that she be ordered, initially, to receive therapy on an outpatient basis, and that the court revisit the matter in 90 days at which time the option of inpatient treatment would be available if defendant was not being cooperative.

¶ 39 The court determined that defendant would be placed for treatment in the custody of DHS. The court ordered defendant to be placed in a secure facility. That directive was subsequently modified to allow for treatment in a nonsecure inpatient facility pursuant to the recommendation of the clinical director of the McFarland Mental Health Center.

¶ 40 Defendant timely filed notice of appeal on April 27, 2012. Contemporaneously, she filed a "Demand Letter for Formal Correction," seeking to "hold Tim Brown accountable for 'Bearing FALSE Witness' the 8th Great Commandment and for Defamation."

¶ 41 The appellate court affirmed the judgment of the circuit court. The court noted, at the outset, that defendant had been found fit to stand trial during the pendency of the appeal. The court thus found "the issue of whether she received the effective assistance of counsel during the proceedings below is moot." 2013 IL App (2d) 120476, ¶ 4. The court nonetheless found that the collateral consequences exception to mootness applied and proceeded to consider defendant's appeal on the merits. 2013 IL App (2d) 120476, ¶ 4.

¶ 42 The appellate court began its analysis with what must be the preeminent analytical proposition in this context: "The due process clause forbids conviction of a defendant who is unfit to stand trial." 2013 IL App (2d) 120476, ¶ 5. The court found no Illinois authority on the issue presented, *i.e.*, whether an attorney must defer to a defendant who takes the position that he or she is fit for trial, and the court ultimately found persuasive the reasoning of the California Court of Appeal:

> " 'Defense counsel's ultimate responsibility to his client is to ensure that [the due process clause's prohibition against convicting a defendant who is unfit to stand trial is] not violated. It would place defense counsel and the integrity of the criminal justice system in an impossible position to suggest that defense counsel must ignore his or her bona fide doubt as to the defendant's present competence, simply because the defendant is personally confident that he or she is competent.' " 2013 IL App (2d) 120476, ¶ 12 (quoting *People v. Harris*, 18 Cal. Rptr. 2d 92, 98 (Cal. Ct. App. 1993)).

¶ 43                                                    ANALYSIS

¶ 44 Before this court, defendant argues that she was denied the effective assistance of counsel insofar as her criminal defense attorney failed to advocate her position that she was fit to stand trial. Defendant acknowledges the two-part test normally applied in ineffective assistance cases (see *Strickland v. Washington*, 466 U.S. 668 (1984)), which requires a showing of prejudice; however, she contends that test does not apply to her case. Rather, she suggests there was an actual or constructive denial of counsel here because, in her view, counsel failed "to subject the prosecution's case to meaningful adversarial testing." Relying upon the Supreme Court's decision in *United States v. Cronic*, 466 U.S. 648, 659 (1984), and this court's opinion in *People v. Hattery*, 109 Ill. 2d 449, 461 (1985), she submits that no showing of prejudice is necessary here. It should be presumed.

¶ 45 Prior to addressing the merit of this case, we note that the parties agree, with defendant's restoration to fitness, this matter is now moot. Defendant argues that two exceptions to the

mootness doctrine would apply: the collateral consequences exception and the public interest exception. The State would not oppose a finding that the public interest exception applies; however, should this court decide that neither the public interest exception nor any other applies, the State suggests the proper course would be to vacate the Second District's judgment, as it was issued after the appeal became moot.

¶ 46    In her opening brief, defendant urges this court to consider the question on appeal—as the appellate court did—by recourse to the collateral consequences exception to the mootness doctrine. The appellate court determined that a finding of unfitness to stand trial " 'could return to plague the [defendant] in some future proceedings or could affect other aspects of the [defendant's] life.' " 2013 IL App (2d) 120476, ¶ 4 (quoting *In re Charles H.*, 409 Ill. App. 3d 1047, 1053 (2011)). The appellate court summarily concluded: "That is the case here." 2013 IL App (2d) 120476, ¶ 4. We note that *Charles H.* involved involuntary commitment under section 3-600 of the Mental Health and Developmental Disabilities Code (405 ILCS 5/3-600 (West 2008)) pursuant to findings that respondent suffered from a mental illness and was likely to engage in dangerous conduct. *Charles H.*, 409 Ill. App. 3d at 1051. Here, the question before the circuit court concerned defendant's inability to understand the nature and purpose of the proceedings against her or assist in her defense. The finding that defendant was unfit to stand trial does not entail the same kind of determination as a finding that a person is mentally ill and a danger to himself or others. Fitness speaks only to a person's ability to function within the context of a trial; it does not refer to sanity or competence in other areas. *People v. Murphy*, 72 Ill. 2d 421, 432-33 (1978). "The issue is not mental illness, but whether defendant could understand the proceedings against him and cooperate with counsel in his defense. If so, then, regardless of mental illness, defendant will be deemed fit to stand trial." *People v. Easley*, 192 Ill. 2d 307, 323 (2000). Although the consequence of involuntary commitment for treatment may be the result in both instances, the *collateral* consequences of the two findings are not necessarily the same. Defendant does not elaborate on the collateral consequences that flow from a finding that a defendant is unfit to stand trial.

¶ 47    Alternatively, the parties suggest that the public interest exception may apply. The State argues that this court need not address the collateral consequences exception if this court so concludes. The public interest exception has three requirements: (1) the question presented must be public rather than case-specific in nature; (2) an authoritative determination is needed to guide public officers; and (3) the question is likely to recur. *In re Rita P.*, 2014 IL 115798, ¶ 36; *In re Shelby R.*, 2013 IL 114994, ¶ 16. The State asserts that the first two elements appear to be readily met. According to the State, the main reasons for rejecting or accepting defendant's claim of ineffective assistance depend on the scope of defense counsel's duty to honor a putatively unfit client's wishes, not the specific facts of her case. Thus, the issue is "one of general applicability" and is public in nature. Further, the State suggests that an authoritative determination of the issue will guide appointed defense attorneys and trial judges with respect to their obligations. The harder question, for the State, is whether the issue is likely to recur. As the State observes, to date, Illinois authority on point is sparse. The appellate court's resort to California case authority seems to bear that out.

¶ 48    We believe that the public interest exception applies to warrant review in this appeal. This case, it seems to us, presents an opportunity to speak to a circumstance where defense

- 13 -

counsel quite reasonably believes that his client is unfit to stand trial, but the unfit client opposes that position, where the facts of the case are not such as to make fitness even arguable, and where it is highly improbable—given the wealth of evidence in the record (in the form of defendant's own thoughts as expressed in her *pro se* filings)—that controverting evidence could have been brought to bear upon the issue. Thus, this case presents an opportunity to address the responsibilities of a criminal defense attorney in the virtual abstract, without case-specific, nuanced considerations of evidentiary weight, in a situation where the court, and every attorney involved, appears to have recognized that defendant was unfit. Indeed, there is a reason why defendant urges us to review counsel's actions under the standards announced in *United States v. Cronic*, 466 U.S. 648, 659 (1984), as no specific showing of prejudice is required. We have here the opportunity to begin building a body of law, where none exists, by addressing the responsibilities of defense counsel with respect to the matter of his or her client's fitness. In light of these considerations, we believe the first two criteria for the public interest exception are met. With respect to the third prerequisite for application of the public interest exception, we find that this question—or more precisely variants of it—are likely to recur. While the scant precedent in this area is puzzling, the insight provided by the record in this case suggests to us that this cannot be the only instance where a troubled defendant and defense counsel are at odds over the question of defendant's fitness to stand trial.

¶ 49   On the merits, the State summarizes defendant's position in this appeal thusly: "[D]efendant claims that when the People raise a *bona fide* doubt about a defendant's fitness before trial and the defendant asserts that she is fit, defense counsel is constitutionally obliged to fight for a finding of fitness—even if the evidence tells counsel his client is unfit." Given the record before us, we believe that is more or less an accurate summation, notwithstanding defendant's insistence that defense counsel did *not* believe defendant was unfit because defense counsel was not the first to raise the issue.

¶ 50   As it is a premise that runs throughout defendant's argument, we first address—and reject—defendant's suggestion that defense counsel did not have doubts about defendant's fitness initially and did not ultimately believe defendant was unfit by the time of the fitness hearing. The fact that the State was the first to raise the question of defendant's fitness does not convince us that defense counsel did not question defendant's fitness. The State raised the issue of defendant's fitness immediately upon defendant's initial appearance in court on the latter-filed trespass charge. By that time, the attorneys for both sides, and the court, had had the opportunity to observe defendant in court and review the content of her filings in her initial cases. The fact that defense counsel did not jump in and make the request before the State signifies nothing in our opinion. That counsel had "no objection" to an evaluation suggests that counsel, too, thought an evaluation was in order. Moreover, defendant does not explain how defense counsel would have rendered deficient assistance by merely agreeing to an evaluation that would provide additional information as to his client's condition. It seems a reasonable assumption that the evaluation, and additional filings by defendant, ultimately cemented counsel's opinion, by the time of the fitness hearing, that defendant was unfit. Counsel's request for an independent examination of defendant by Robert Lewis, and his refusal to stipulate to the content of the report resulting from the court-ordered examination by Dr. Brown, do not convince us otherwise. Those actions, in context, seem more reasonably explained as, respectively, appeasement and deference to defendant's wishes, and

fulfillment of what counsel rightly saw as his responsibility to test the reliability of Brown's evaluative process. Neither supports the contention that counsel believed defendant was fit. All indications are that defense counsel shared the belief of the State, and ultimately the court, that defendant was unfit to stand trial. Thus, the issue is, as the State contends, whether defense counsel is constitutionally obligated to argue for a finding of fitness, in deference to defendant's wishes, when counsel is convinced, and the evidence indicates, that defendant is in fact unfit.

¶ 51    As the State asserts, defendant's position is untenable. No plausible interpretation of the right to counsel would require defendant's lawyers to fight for an outcome that, in counsel's estimation—and in fact—would violate due process. The due process clause of the fourteenth amendment bars prosecution of a defendant unfit to stand trial. *People v. Shum*, 207 Ill. 2d 47, 57 (2003). As the Supreme Court made clear in *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996): " 'Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so. [Citation.]' " *Cooper*, 517 U.S. at 354 (quoting *Riggins v. Nevada*, 504 U.S. 127, 139-40 (1992) (Kennedy, J., concurring in the judgment)). In *Cooper*, the Court stated that a defendant may not be put to trial unless he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him. *Cooper*, 517 U.S. at 354. Where a defendant does not have that ability, how can a defendant make informed decisions regarding the course of her representation? In *Pate v. Robinson*, 383 U.S. 375, 384 (1966), the Court observed that it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently waive his right to have the court determine his capacity to stand trial. It would seem to us a corollary principle that such a defendant may not direct defense counsel to do so.

¶ 52    We reject defendant's suggestion that defense counsel's actions violated the standards set by the Supreme Court in *Cronic* and this court in *Hattery*. According to defendant, "counsel's failure to advocate the defendant's position, which is contrary to that of the State, where a decision favorable to the State could subject the defendant to undesirable consequences is precisely the type of harm the *Cronic* and *Hattery* decisions attempted to obviate." We think not. To begin with, neither case had anything to do with a defendant's fitness to stand trial. Those cases concerned adequate representation *at the trial itself*. See *Cronic*, 466 U.S. at 655 (" 'The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.' " (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975))). This case, unlike *Cronic* and *Hattery*, involves a threshold consideration that governs whether defendant may, consistent with due process, be tried at all. That the matter of fitness is a preeminent consideration in criminal proceedings—and not necessarily dictated by adversarial considerations—is evinced by the fact that the issue of defendant's fitness "may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial." 725 ILCS 5/104-11(a) (West 2010). Defendant's theory of adversarial testing would require defense counsel to oppose the State no matter what position it takes—if an incompetent defendant so desires—regardless of the

evidence, even though the defendant is unable to appreciate the nature of the proceedings against her or assist in her defense. That position is simply absurd. We believe the first responsibility of any criminal defense attorney, upon his or her appointment to representation, should be to independently assess whether the client is fit to stand trial. In fulfilling that preliminary responsibility, and taking appropriate action thereon, irrespective of the State's position, a defense attorney has afforded his client appropriate representation.

¶ 53    Though defendant's argument focuses solely upon the responsibilities of her appointed counsel *as a criminal defense attorney*, defendant makes at least two oblique allusions in her briefs to "undesirable consequences" that may stem from a finding of unfitness, which "may not be in defendant's best interest." Presumably referring to those "undesirable consequences," defendant, in her original brief, suggests:

> "Although trial counsel might regard a finding of unfitness to be a strategically beneficial resolution to the pending charges, such an outcome, as here, ultimately may not be in the defendant's best interest. The appointment of a guardian *ad litem* in this situation would better protect the defendant's interests."

Without supporting argument for the assertion that the "same concerns are implicated here," defendant references this court's decision in *People v. Austin M.*, 2012 IL 111194. However, the point this court made in *Austin M.* was that counsel in that delinquency case should not have been acting as both a guardian *ad litem and* defense counsel; he should have been functioning solely as the latter and, in attempting to do both, counsel labored under a *per se* conflict of interest. *Austin M.*, 2012 IL 111194, ¶ 86. Counsel in this case was functioning appropriately as a criminal defense attorney, ensuring that an unfit client was not tried on criminal charges in violation of due process guarantees. Defendant presents no argument, and cites no authority, to explain why *Austin M.* applies or why she should have been appointed a guardian *ad litem*.

¶ 54    We assume that the "undesirable consequences" to which defendant refers concern the court-ordered, inpatient treatment in this case. We note, in passing, that defendant's attorney *did* argue against inpatient treatment, observing that outpatient treatment could be tried first, with inpatient treatment as an option if defendant did not cooperate. Notwithstanding counsel's argument, the circuit court rejected outpatient treatment. In any event, if defendant's contention is that someone in defendant's position should have both a criminal defense attorney and a guardian *ad litem*, the latter obligated to argue for defendant's fitness—at the direction of defendant—irrespective of the evidence, she fails to explain how that would work; nor does she cite authority supporting that view.

¶ 55    As we recently reiterated in *Bartlow v. Costigan*, 2014 IL 115152, ¶ 52, this court will consider only fully briefed and argued issues. See also *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010) (noting that an issue "merely listed or included in a vague allegation of error is not 'argued' " and does not satisfy Supreme Court Rule 341(h)). If the intended implications of the cryptic allusions in defendant's briefs are that the right to counsel at this stage of a criminal proceeding under the Code of Criminal Procedure, and the provisions of the Code itself, somehow collide and conflict with the right to counsel under, and the provisions of, the Mental Health and Developmental Disabilities Code (see 405 ILCS 5/3-805 (West 2010) (providing that "[e]very respondent alleged to be subject to involuntary admission on an inpatient or outpatient basis shall be represented by counsel")) her assertion—such as it

is—is wholly inadequate to warrant our consideration at this juncture. Accordingly, we do not consider it.

¶ 56       Before concluding, we emphasize the limits of our holding. Where, as here, the evidence clearly indicates that defendant is unfit to stand trial, but a defendant contends that he or she is fit, defense counsel is not obligated to adopt the defendant's position and argue for a finding of fitness. In fact, in doing so, defense counsel would be violating his duty to the client and suborning a violation of due process.

¶ 57       For the foregoing reasons, the judgment of the appellate court is affirmed.

¶ 58       Affirmed.