**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230092-U

Order filed June 7, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, Bureau County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Appeal Nos. 3-23-0092 and 3-23-0093 Circuit Nos. 22-CF-67 and 22-CM-55 |
| MATTHEW J. PAIRADEE, | ) ) | Honorable James A. Andreoni, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Peterson and Albrecht concurred in the judgment.

_____

**ORDER**

¶ 1   *Held*:  The trial court properly granted defendant's motion for a directed verdict and defendant did not receive ineffective assistance of counsel.

¶ 2   Defendant, Matthew J. Pairadee, appeals the trial court's finding that he was unfit to stand trial, arguing the court erred in granting defense counsel's motion for a directed verdict and counsel provided ineffective assistance. We affirm.

¶ 3   I. BACKGROUND

¶ 4 On April 22, 2022, defendant was charged in case No. 22-CM-55 (Case 1) with aggravated assault (720 ILCS 5/12-2(c)(1) (West 2022)). Defense counsel raised concerns about defendant's fitness to stand trial. The court, however, found no *bona fide* doubt as to defendant's fitness and later granted his request to proceed *pro se*. On October 25, 2022, defendant was charged in case No. 22-CF-67 (Case 2) with home invasion (*id.* § 19-6(a)(3)) and three counts of first degree murder (*id.* § 9-1(a)(1), (2)). The two cases were consolidated. Defense counsel again raised concerns about defendant's fitness and the court appointed Dr. Terry Killian to conduct a fitness evaluation.

¶ 5 On December 15, 2022, Killian issued a forensic psychiatric report wherein he diagnosed defendant with delusional disorder and opined defendant was not fit to stand trial. The court set the matter for a fitness hearing before a jury. The court granted the State's request for Dr. Jean Clore to conduct an additional fitness examination. On January 24, 2023, Clore issued a report diagnosing defendant with a delusional disorder that rendered him unfit to stand trial.

¶ 6 During a February 2023 status hearing, defendant stated he had new evidence "that would basically end this court case before even the issue of fitness." He asserted someone had lied in an interview and the indictment was not properly signed. The court informed defendant it could not do anything before ruling on fitness. Defendant then stated,

> "I would like to bring up the Supreme Court Rule 2.4 for the record and just make a note of that for the Supreme Court, and that I hope that you guys understand that what you're doing in this courtroom could make you lose your license to practice law. The American Bar Association will hear about what you're doing in here and you could be arrested, and anything that you say can and will be used in court—in this court case for your trial."

2

Later, defendant stated off the record that if the court allowed him to represent himself, the matter would be over and there would be no need for a fitness hearing. The court informed defendant that until a fitness determination was made, defendant could not knowingly and voluntarily waive his right to counsel. Defendant responded:

> "I would like to state for the record that there are many military judges that will toss out this issue on fitness, that I deserve whistleblower protection, and that I do not tolerate my character being attacked like this or the issue even being brought up when I have gotten charges dropped by myself. So I willingly, knowingly and voluntarily represented myself successfully in the past and I will continue to do so. I stated when I first came in here that this court case involves terrorism and that public officials were being manipulated, and [defense counsel] is one of those people."

¶ 7                              A. Expert Testimony

¶ 8        On March 6, 2023, the court held a fitness hearing before a jury. The State called Killian and Clore as witnesses.

¶ 9                        1. *Dr. Killian's Testimony and Report*

¶ 10       Killian testified he has been a licensed psychiatrist since 1986. He completed around 2000 fitness evaluations and testified at over 150 fitness hearings.

¶ 11       Before interviewing defendant, he reviewed defendant's background documents, which revealed the following. On April 21, 2022, defendant's girlfriend, Gabby, called the police to report defendant was having a mental health episode. Gabby explained that she and defendant had been arguing about their 10-month-old child (C.A.). She attempted to leave the house with C.A., but defendant prevented her from leaving or from using a phone. When her parents arrived at the

house, defendant pointed a gun at Dawn as she tried to enter the house. He waved the gun around "wildly" and instructed Dawn to leave.

¶ 12 Gabby informed police that defendant was paranoid and suffered from severe mental health issues. According to her, defendant believed he was "being followed by" the Federal Bureau of Investigation (FBI), Central Intelligence Agency (CIA), and the National Security Agency (NSA). He also believed she was injecting C.A. with chemicals to bleach her skin, frequently talked about suicide, and usually kept a gun in his possession. Dawn told police defendant had "numerous mental health issues and was out of control."

¶ 13 Defendant informed police he pulled a gun on Dawn because she had malicious intent. Defendant explained that Dawn and her husband, Jerome, were part of a "death cult" and he suspects they are involved in sex trafficking and cannibalism.

¶ 14 On May 27, 2022, defendant filed a *pro se* motion to dismiss in Case 1. He argued no law says "one cannot point a gun at someone," and Dawn "was breaking and entering and trespassing." He also argued his conduct was justified, alleging Dawn was a "child stealer and child abuser" who had committed a hate crime by "whitewashing" his daughter. In an undated statement, defendant accused Dawn of being a pedophile, invading his home to "steal" his daughter, possessing a dark-web phone, and earning money from child sex trafficking.

¶ 15 In June 2022, the Department of Children and Family Services (DCFS) indicated defendant for "child abuse and/or neglect." Defendant submitted a request to appeal the indicated finding. In his submission, defendant stated he believed Gabby was dead. He alleged Dawn was a known child abuser who had locked one of her children in a room without food or water. He further alleged Dawn had sexually, physically, and psychologically abused C.A. He claimed a DCFS employee

4

had changed paperwork regarding Dawn and "they use artificial intelligence to manipulate all [defendant's] web packets."

¶ 16    With respect to Case 2, Killian's report included a cursory account of the events underlying the alleged home invasion and first degree murder charges. On October 25, 2022, Dawn called the police to report defendant had "ripped [C.A.] from her arms" and she heard gunshots shortly thereafter. A witness observed Dawn's husband, Jerome, lying dead on the street with gunshot wounds to his stomach and head. Defendant was arrested at 3 a.m. following an eight-hour standoff with police. He admitted to shooting Jerome.

¶ 17    In December 2022, Killian interviewed defendant via Zoom. At the start of the interview, defendant stated he wished to livestream the interview to expose the corruption in Bureau County, which involves judges, prosecutors, police, and "many other persons." He also stated he did not believe the state's attorney had enough evidence against him to proceed to trial.

¶ 18    Killian asked defendant what led to his criminal charges. Defendant stated he was a whistleblower who put his life in danger by writing a blog post about how vaccines genetically modify people and how COVID-19 was a lab-created virus. When asked about the specific events leading to his arrest in Case 1, defendant stated he "knew" Dawn was sex trafficking Gabby, who was of Guatemalan origin. In March 2022, Gabby left home with C.A.—who was "darker with darker hair." When Gabby returned, C.A. was "pasty white." Defendant believed Dawn had "whitewashed" his baby, and had effectively "commit[ed] about four different crimes." On April 21, 2022, after a dispute with Gabby, defendant told Gabby to spend the night with her mom. He did not want to break up with Gabby, so he asked Dawn to pick her up. Dawn had previously made it clear defendant could not enter her home. After Dawn arrived, she entered defendant's residence but defendant asked her to leave and informed her she was trespassing. When she refused to leave,

defendant pointed a gun at her because she was committing home invasion and he did not know whether she would commit another felony. He believed Dawn was "high up in a satanic cult" and the police were involved in the conspiracy because they arrested him.

¶ 19　　　　Killian asked defendant what happened on October 25, 2022. Defendant stated he had previously called local police and DCFS because he believed his child was being abused. He also called "Bureau County for a wellness check." Dawn, who was Gabby's adoptive mother, placed a restraining order against him, so "at that point [he] was kind of exhausted waiting for legal proceedings." On October 24, he suspected Dawn had sprayed sewage all over his house, and decided to rescue his daughter from Dawn. Upon arriving at Dawn's home, he asked to see C.A. and Gabby, but Dawn refused. After defendant rescued C.A., Jerome left his truck running on the side of the road and ran toward defendant. Defendant feared Jerome was going to sexually assault C.A. since he worked for sex traffickers and had raped Gabby. Defendant began to run away but turned around and shot Jerome in the stomach and then executed him by shooting him in the head. Defendant believed it was self-defense.

¶ 20　　　　Killian concluded defendant was unfit to stand trial, and noted defendant made other delusional comments throughout the interview. Killian stated, even though defendant understood the court proceedings and charges, he was "pretty clearly not able" to assist counsel "in a reasonable, rational fashion" as required, "because his perception of his situation is so very, very influenced by his extensive delusional beliefs."

¶ 21　　　　　　　　　　　　　　*2. Dr. Clore's Testimony and Report*

¶ 22　　　　Clore testified she was a clinical psychologist employed since 2011 by the University of Illinois College of Medicine. She conducted between 400 and 500 fitness evaluations. She reviewed documents relevant to the matter before meeting with defendant on January 20, 2023.

6

During the interview, defendant made many delusional statements. He stated he was a CEO "being attacked by several other CEOs, like Elon Musk, Rockefeller, et cetera." Clore concluded defendant's primary delusion was a "paranoid conspiracy type of belief that Gabby's parents were involved in an underground sex-trafficking ring and that Gabby and C.A. had been victims of their abuse."

¶ 23　　　Clore testified that a person with a delusional disorder "starts to believe and strongly hold these inaccurate beliefs," which are often paranoid in nature. Clore believed these delusions rendered defendant unfit for trial because they made it "impossible [for defense counsel] to have a conversation with him that is about his case that is also based in reality." Even though defendant generally understood court procedures, "he believes everyone in the courtroom is conspiring against him, doesn't trust them to fulfill their roles and are working for his ex-girlfriend's mother." The State then rested.

¶ 24　　　　　　　　　　　　B. Motion for Directed Verdict

¶ 25　　　Defense counsel informed the court defendant wished to testify against his advice:

> "I believe from the conversations I've had with him, that [the previous public defender] has had with him, that the testimony of the doctors regarding delusional disorder are in fact accurate. I believe that the delusions color rational thought as it relates to him, and I don't think that he can make a rational decision on waiving Fifth Amendment rights herein.
>
> To that end, [Y]our Honor, reluctantly I'm making a motion for a directed verdict herein."

The State opposed the motion, arguing the matter should go to the jury because defendant had a clear recollection of the relevant events and was familiar with the court system. Defense counsel

argued a directed verdict was still appropriate as the State failed to introduce any evidence that defendant could assist in his own defense. When asked by the court, the State was unable to point to any evidence for support. The court granted the motion for a directed verdict, stating "there is absolutely no testimony that I could find, viewed in a light most favorable to the State, that would indicate that the State has met its burden" of establishing defendant can assist in his own defense. This appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27        On appeal, defendant argues (1) the trial court erred in granting motion for a directed verdict, and (2) defense counsel rendered ineffective assistance by moving for a directed verdict instead of allowing defendant to testify. We will consider each issue in turn.

¶ 28                                 A. Directed Verdict

¶ 29        Due process prohibits the prosecution of a defendant who is not fit to stand trial. *People v. Haynes*, 174 Ill. 2d 204, 226 (1996). A defendant is unfit to stand trial if he is unable to either (1) understand the nature and purpose of the proceedings, or (2) assist in his defense. 725 ILCS 5/104-10 (West 2022). All defendants are initially presumed to be fit. *Id.* If a *bona fide* doubt of a defendant's fitness is raised, the court shall hold a fitness hearing before proceeding further. *Id.* § 104-11(a). At the fitness hearing, the State bears the burden of showing defendant is fit by a preponderance of the evidence. *Id.* § 104-11(c).

¶ 30        A directed verdict is appropriate when the party bearing the burden of proof has failed to establish a *prima facie* case. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 123 (2004). The party with the burden of proof "must present at least some evidence on every essential element of the cause of action." *Id.* In other words, a directed verdict is appropriate if the court finds " 'a total failure or lack of evidence to prove any necessary element of the plaintiff's case.' " *People v.*

8

*Hancock*, 2014 IL App (4th) 131069, ¶ 137 (quoting *Perfetti v. Marion County, Illinois*, 2013 IL App (5th) 110489, ¶ 15). The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Id.* ¶ 136. We review the grant of a directed verdict *de novo*. *Id.* Defense counsel may move for a directed verdict of unfitness following the State's presentation of evidence even against defendant's wishes because "[n]o plausible interpretation of the right to counsel would require defendant's lawyers to fight for an outcome that, in counsel's estimation—and in fact—would violate due process." *People v. Holt*, 2014 IL 116989, ¶ 51; see, *e.g.*, *People v. Wilber*, 2018 IL App (2d) 170328, ¶ 14.

¶ 31　　Prior to making a fitness determination, the fact finder is required to "analyze and evaluate the basis for an expert's opinion instead of merely relying upon the expert's ultimate opinion." *People v. Contorno*, 322 Ill. App. 3d 177, 179 (2001). A trial court errs where it relies solely upon the parties' stipulation and expert report without conducting an independent inquiry into a defendant's fitness. *People v. Cook*, 2014 IL App (2d) 130545, ¶ 15. But the fact finder "cannot reject an expert's opinion that a defendant is unfit without evidence that the defendant is fit." *People v. Lucas*, 388 Ill. App. 3d 721, 728 (2009).

¶ 32　　Here, the State presented two experts who testified defendant was unfit to stand trial because he was unable to assist in his own defense. The record is replete with support for the experts' conclusions. *Supra* ¶¶ 11-23. Defendant believes Dawn is part of a satanic cult of cannibalistic child sex traffickers that has corrupted the entirety of the Bureau County justice system, including his own public defender. He repeated this delusional belief numerous times to the police and the State's experts. Defendant also believes powerful corporate executives were attacking him for his whistleblowing activities, a DCFS employee was using "artificial intelligence

to manipulate" his web packets, his blog post about COVID-19 and vaccines exposed him to danger, and governmental intelligence agencies were surveilling him.

¶ 33     In Clore's opinion, defendant is unfit to stand trial because his delusional disorder makes it "impossible [for defense counsel] to have a conversation with him that is about his case [and] that is also based in reality." We agree. The evidence established defendant is incapable of assisting in his own defense where his delusional beliefs severely distort his perception of his legal situation.

¶ 34     Alternatively, defendant argues the court erred in granting the motion before hearing all the evidence supporting his fitness. This argument fails for the same reasons outlined above. *Supra* ¶¶ 32-33. Further, denying an otherwise meritorious motion for a directed verdict is practically futile in this case. "Doing so would not result in the jury hearing any additional evidence from the State, and defense counsel, having moved for a directed verdict of unfitness, presumably would not introduce evidence that the defendant was fit." *Wilber*, 2018 IL App (2d) 170328, ¶ 16. By moving for a directed verdict, defense counsel signaled he had no evidence to present showing defendant could assist in his own defense. Continuing to assess fitness when clear evidence of unfitness exists undercuts the experts' testimony and needlessly prolongs the hearing with no discernible benefit to defendant.

¶ 35                                      B. Ineffective Assistance

¶ 36     Defendant next argues counsel was ineffective for moving for a directed verdict as it prevented defendant from testifying. Illinois courts review claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. Wise*, 2019 IL App (2d) 160611, ¶ 51. Under *Strickland*, counsel renders ineffective assistance when (1) counsel's performance falls below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's deficient performance, the results of the

10

proceedings would have had a different outcome. *Id.* "A defendant bears the burden of proof on both elements of this test." *People v. Burks*, 343 Ill. App. 3d 765, 775 (2003). "[T]he failure to establish either [prong under the *Strickland* test] precludes a finding of ineffective assistance of counsel." *People v. Cherry*, 2016 IL 118728, ¶ 31.

¶ 37 At the outset, we note the legislature has not provided defendants with the absolute right to testify at a fitness hearing. Unlike federal law, which affords defendants the right to testify at a fitness hearing (18 U.S.C § 4247(d) (2006)), Illinois law only requires the defendant's presence at a fitness hearing (see 725 ILCS 5/104-16 (West 2022)).

¶ 38 We find counsel's performance did not fall below an objective standard of reasonableness. Defense counsel may properly move for a directed verdict of unfitness even against his client's wishes. *Holt*, 2014 IL 116989, ¶ 51. Indeed, "a defense attorney has afforded his client appropriate representation" by "independently assess[ing] whether the client is fit to stand trial," and taking appropriate action. *Id.* ¶ 52. Here, defense counsel assessed defendant's fitness and, believing he was unfit to stand trial, moved for a directed verdict. Defense counsel was rightly concerned that anything defendant said during the fitness hearing could be used against him at trial. Under *Holt*, counsel's motion amounted to appropriate representation.

¶ 39 Moreover, defendant was provided ample opportunity to demonstrate his fitness before the hearing. He spoke with two mental health experts in a setting that precluded the use of his statements to establish his guilt. See 725 ILCS 5/104-14 (West 2022); see also *People v. Lee*, 128 Ill. App. 3d 774, 780 (1984) ("The restrictions contained in [section 104-14] are derived from a defendant's fifth amendment privilege against self-incrimination."). He was further allowed to make statements on the record in Case 1, at the status conference in Case 2, and in his submissions to DCFS. Nothing in the record before us indicates defendant could assist in his own defense.

¶ 40        Defendant also failed to establish he was prejudiced by counsel's decision to move for a directed verdict. To establish prejudice, a defendant must demonstrate a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. " 'Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced.' " *People v. Johnson*, 2021 IL 126291, ¶ 55 (quoting *People v. Patterson*, 2014 IL 115102, ¶ 81).

¶ 41        In conclusory fashion, defendant argues his testimony would have likely changed the outcome of the fitness hearing. This argument is insufficient to establish ineffective assistance. See *Johnson*, 2021 IL 126291, ¶ 55. Not only does defendant fail to present any potential testimony that could have changed the hearing's outcome, but he also faces overwhelming evidence of his lack of fitness. See *People v. Whiting*, 365 Ill. App. 3d 402, 408-09 (2006) (directed verdict prejudiced defendant where the evidence was close and where defendant's testimony was the only evidence available to rebut testimony as to mental state). Thus, where neither prong of *Strickland* is met, defendant's ineffective assistance claim fails.

¶ 42                                III. CONCLUSION

¶ 43        For the reasons stated, we affirm the judgment of the trial court of Bureau County.

¶ 44        Affirmed.